UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA

| | |
|---|---|
| PRECISION ROOFING OF N. FLORIDA INC. individually and on behalf of all others similarly situated,<br><br>   Plaintiff,<br><br>v.<br><br>CENTERSTATE BANK,<br><br>   Defendant. | Civil Action No. _____<br><br>**JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff Precision Roofing of N. Florida Inc. ("Plaintiff" or "Precision Roofing"), individually and on behalf of all others similarly situated, complains and alleges as follows based on personal knowledge as to itself, on the investigation of its counsel, and on information and belief as to all other matters:

### INTRODUCTION

1. This is a civil action seeking monetary damages, restitution and declaratory relief from Defendant, Centerstate Bank ("Centerstate"), arising from bank's routine practice of assessing and collecting "overdraft fees" ("OD Fees") on accounts that were never actually overdrawn.

2. This practice breaches contract promises made in Centerstate's adhesion contracts.

3. Centerstate's customers have been injured by Centerstate's improper practices to the tune of millions of dollars bilked from their accounts in violation of their agreements with Centerstate.

4. On behalf of itself and the Class, Plaintiff seeks damages, restitution, and injunctive relief for Defendant's violations as set forth more fully below.

## JURISDICTION

5. This Court has original jurisdiction over this putative class action lawsuit pursuant to the Class Action Fairness Act of 2005, 28 U.S.C. §§ 1332(d)(2) & (6), because the aggregate sum of the claims of the members of the putative class exceeds $5 million, exclusive of interest and costs, because Plaintiff brings this action on behalf of a proposed class that is comprised of over one hundred members, and because at least one of the members of the proposed class is a citizen of a different state than Centerstate.

## PARTIES

6. Plaintiff Precision Roofing of N. Florida Inc. has a business checking account with Centerstate. Precision Roofing of N. Florida Inc. Inc. is located in St. Augustine, Florida. Marie Fox, an authorized joint accountholder, resides in St. Augustine, Florida.

7. Defendant Centerstate Bank is 75th largest bank in the United States and holds more than $17 billion in assets. Centerstate is headquartered in Davenport, Florida and has branches in Florida, Georgia, and Alabama.

## FACTUAL ALLEGATIONS

### I. CENTERSTATE CHARGES OD FEES ON TRANSACTIONS THAT DO NOT ACTUALLY OVERDRAW THE ACCOUNT

**A. Overview of Claim**

8. Plaintiff has a checking account with Centerstate.

9. Centerstate issues debit cards to its checking account customers, including Plaintiff, which allows its customers to have electronic access to their checking accounts for purchases, payments, withdrawals and other electronic debit transactions.

10. Pursuant to its standard account agreement, Centerstate charges fees (currently in the amount of $35) for debit card transactions that purportedly result in an overdraft.

11. Plaintiff brings this cause of action challenging Centerstate's practice of charging OD Fees on what are referred to in this complaint as "Authorize Positive, Purportedly Settle Negative Transactions" ("APPSN Transactions").

12. Here's how it works. At the moment debit card transactions are authorized on an account with positive funds to cover the transaction, Centerstate immediately reduces accountholders' checking accounts for the amount of the purchase, sets aside funds in a checking account to cover that transaction, and as a result, the accountholder's displayed "available balance" reflects that subtracted amount. As a result, customers' accounts will always have sufficient available funds to cover these transactions because Centerstate has already sequestered these funds for payment.

13. However, Centerstate still assesses crippling OD Fees currently in the amount of $35 on many of these transactions, and mispresents its practices in its account documents.

14. Despite putting aside sufficient available funds for debit card transactions at the time those transactions are authorized, Centerstate later assesses OD Fees on those same transactions when they purportedly settle days later into a negative balance. These types of transactions are APPSN Transactions.

15. Centerstate maintains a running account balance in real time, tracking funds accountholders have for immediate use. This running account balance is adjusted, in real-time, to account for debit card transactions at the precise instance they are made. When a customer makes a purchase with a debit card, Centerstate sequesters the funds needed to pay the transaction, subtracting the dollar amount of the transaction from the customer's available balance. Such funds

are not available for any other use by the accountholder, and such funds are specifically associated with a given debit card transaction.

16. Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

17. That means when any *subsequent*, intervening transactions are initiated on a checking account, they are compared against an account balance that has already been reduced to account for any earlier debit card transactions. This means that many subsequent transactions incur OD Fees due to the unavailability of the funds sequestered for those debit card transactions.

18. Still, despite keeping those held funds off-limits for other transactions, Centerstate improperly charges OD Fees on those APPSN Transactions, although the APPSN Transactions *always* have sufficient available funds to be covered.

19. Indeed, the Consumer Financial Protection Bureau ("CFPB") has expressed concern with this very issue, flatly calling the practice "unfair" and/or "deceptive" when:

> A financial institution authorized an electronic transaction, which reduced a customer's available balance but did not result in an overdraft at the time of authorization; settlement of a subsequent unrelated transaction that further lowered the customer's available balance and pushed the account into overdraft status; and when the original electronic transaction was later presented for settlement, because

>of the intervening transaction and overdraft fee, the electronic transaction also posted as an overdraft and an additional overdraft fee was charged. Because such fees caused harm to consumers, one or more supervised entities were found to have acted unfairly when they charged fees in the manner described above. Consumers likely had no reason to anticipate this practice, which was not appropriately disclosed. They therefore could not reasonably avoid incurring the overdraft fees charged. Consistent with the deception findings summarized above, examiners found that the failure to properly disclose the practice of charging overdraft fees in these circumstances was deceptive. At one or more institutions, examiners found deceptive practices relating to the disclosure of overdraft processing logic for electronic transactions. Examiners noted that these disclosures created a misimpression that the institutions would not charge an overdraft fee with respect to an electronic transaction if the authorization of the transaction did not push the customer's available balance into overdraft status. But the institutions assessed overdraft fees for electronic transactions in a manner inconsistent with the overall net impression created by the disclosures. Examiners therefore concluded that the disclosures were misleading or likely to mislead, and because such misimpressions could be material to a reasonable consumer's decision-making and actions, examiners found the practice to be deceptive. Furthermore, because consumers were substantially injured or likely to be so injured by overdraft fees assessed contrary to the overall net impression created by the disclosures (in a manner not outweighed by countervailing benefits to consumers or competition), and because consumers could not reasonably avoid the fees (given the misimpressions created by the disclosures), the practice of assessing fees under these circumstances was found to be unfair.

Consumer Financial Protection Bureau, Winter 2015 "Supervisory Highlights."

20. There is no justification for these practices, other than to maximize Centerstate's OD Fee revenue. APPSN Transactions only exist because intervening checking account transactions supposedly reduce an account balance. But Centerstate is free to protect its interests and either reject those intervening transactions or charge OD Fees on those intervening transactions—and it does the latter to the tune of millions of dollars each year. But Centerstate was not content with these millions in OD Fees. Instead, it sought millions *more* in OD Fees on these APPSN Transactions.

21. Besides being unfair and unjust, these practices breach contract promises made in Centerstate's adhesion contracts—contracts which fail to inform accountholders about the true

nature of Centerstate's processes and practices. These practices also exploit contractual discretion to gouge accountholders.

22. In plain, clear, and simple language, the checking account contract documents covering OD Fees promise that Centerstate will only charge OD Fees on transactions that have insufficient funds to "cover" that debit card transaction.

23. In short, Centerstate is not authorized by contract to charge OD Fees on transactions that have not overdrawn an account, but it has done so and continues to do so.

**B.     Mechanics of a Debit Card Transaction**

24. A debit card transaction occurs in two parts. First, authorization for the purchase amount is instantaneously obtained by the merchant from Centerstate. When a merchant physically or virtually "swipes" a customer's debit card, the credit card terminal connects, via an intermediary, to Centerstate, which verifies that the customer's account is valid and that sufficient available funds exist to "cover" the transaction amount.

25. At this step, if the transaction is approved, Centerstate immediately decrements the funds in an accountholder's account and sequesters funds in the amount of the transaction, but does not yet transfer the funds to the merchant.

26. Indeed, the entire purpose of the immediate debit and hold of positive funds is to ensure that there are enough funds in the account to pay the transaction when it settles, as discussed in the Federal Register notice announcing revisions to certain provisions of the Truth in Lending Act regulations:

> When a consumer uses a debit card to make a purchase, a hold may be placed on funds in the consumer's account to ensure that the consumer has sufficient funds in the account when the transaction is presented for settlement. This is commonly referred to as a "debit hold." During the time the debit hold remains in place, which may be up to three days after authorization, those funds may be unavailable for the consumer's use for other transactions.

Federal Reserve Board, Office of Thrift Supervision, and National Credit Union Administration, Unfair or Deceptive Acts or Practices, 74 FR 5498-01 (Jan. 29, 2009).

27. Sometime thereafter, the funds are actually transferred from the customer's account to the merchant's account.

28. Centerstate (like all credit unions and banks) decides whether to "pay" debit card transactions at authorization. After that, Centerstate is obligated to pay the transaction no matter what. For debit card transactions, that moment of decision can only occur at the point of sale, at the instant the transaction is authorized or declined. It is at that point—and only that point—when Centerstate may choose to either pay the transaction or decline it. When the time comes to actually settle the transaction, it is too late—the financial institution has no discretion and must pay the charge. This "must pay" rule applies industry wide and requires that, once a financial institution authorizes a debit card transaction, it "must pay" it when the merchant later makes a demand, regardless of other account activity. *See* Electronic Fund Transfers, 74 Fed. Reg. 59033-01, 59046 (Nov. 17, 2009).

29. There is no change—no impact whatsoever—to the available funds in an account when this step occurs.

    **C.**    **Centerstate Account Contract**

30. Plaintiff has a Centerstate checking account, which is governed by Centerstate's standardized "Terms and Conditions of Your Account" document ("Deposit Agreement"), Ex. A.

31. The Deposit Agreement expressly promises the available balance is immediately reduced for holds, including those placed immediately on debit card transactions; and confirms that "non-sufficient funds items" are only those items that "overdraw[] your account":

> **A temporary debit authorization hold affects your account balance -** On debit card purchases, merchants may request a temporary hold on your account for a specified sum of money, when the merchant does not know the exact amount of the purchase at the time the card is authorized . . . When this happens, our processing system cannot determine that the amount of the hold exceeds the actual amount of your purchase. This temporary hold, and the amount charged to your account, will eventually be adjusted to the actual amount of your purchase, but it may be up to three days before the adjustment is made. Until the adjustment is made, the amount of funds in your account available for other transactions will be reduced by the amount of the temporary hold. If another transaction is presented for payment in an amount greater than the funds left after the deduction of the temporary hold amount, that transaction will be a nonsufficient funds (NSF) transaction if we do not pay it or an overdraft transaction if we do pay it. You will be charged an NSF or overdraft fee according to our NSF or overdraft fee policy. You will be charged the fee even if you would have had sufficient funds in your account if the amount of the hold had been equal to the amount of your purchase.

Deposit Agreement, Ex. A at 2.

32. The Deposit Agreement also provides that Centerstate makes overdraft determinations when it decides to "honor" transactions, which is the moment of authorization for debit card transactions:

> **Overdrafts** - You understand that we may, at our discretion, honor withdrawal requests that overdraw your account. However, the fact that we may honor withdrawal requests that overdraw the available account balance does not obligate us to do so later. So you can NOT rely on us to pay overdrafts on your account regardless of how frequently or under what circumstances we have paid overdrafts on your account in the past. We can change our practice of paying overdrafts on your account without notice to you. You can ask us if we have other account services that might be available to you where we commit to paying overdrafts under certain circumstances, such as an overdraft protection line-of-credit or a plan to sweep funds from another account you have with us. You agree that we may charge fees for overdrafts. We may use subsequent deposits, including direct deposits of social security or other government benefits, to cover such overdrafts and overdraft fees.

*Id*.

33. For APPSN Transactions, which are immediately deducted from a positive account balance and held aside for payment of that same transaction, there are always funds to cover those transactions—yet Centerstate assesses OD Fees on them anyway.

34. The above promises indicate that transactions are only overdraft transactions when they are authorized into a negative account balance. Of course, that is not true for APPSN Transactions. As the Deposit Agreement states, Centerstate's overdraft service "costs nothing unless the privilege is used - by *initiating* checks, electronic funds transfers, or other payment or withdrawal requests *for more than the available funds in the account*." *Id.* (emphasis added).

35. APPSN transactions are always *initiated* at the time the customer swipes the debit card when there are sufficient available funds in the account.

36. In fact, Centerstate actually authorizes transactions on positive funds, sets those funds aside on hold, then fails to use those same funds to settle those same transactions. Instead, it uses a secret posting process described below.

37. All the above representations and contractual promises are untrue. In fact, Centerstate charges OD Fees even when sufficient funds exist to cover transactions that are authorized into a positive balance. No express language in any document states that Centerstate may impose OD Fees on any APPSN Transactions.

38. The Deposit Agreement misconstrues Centerstate's true debit card processing and overdraft practices.

39. First, and most fundamentally, Centerstate charges OD Fees on debit card transactions for which there are sufficient funds available to cover the transactions. That is despite contractual representations that Centerstate will only charge OD Fees on transactions with insufficient available funds to cover a given transaction.

40. Centerstate assesses OD Fees on APPSN Transactions that ***do*** have sufficient funds available to cover them throughout their lifecycle.

41. Centerstate's practice of charging OD Fees even when sufficient available funds

exist to cover a transaction violates a contractual promise not to do so. This discrepancy between Centerstate's actual practice and the contract causes accountholders like the Plaintiff to incur more OD Fees than they should.

42. Next, sufficient funds for APPSN Transactions are actually debited from the account immediately, consistent with standard industry practice.

43. Because these withdrawals take place upon initiation, they cannot be re-debited later. But that is what Centerstate does when it re-debits the account during a secret batching posting process.

44. In reality, Centerstate's actual practice is to assay the same debit card transaction twice to determine if the transaction overdraws an account—both at the time a transaction is authorized and later at the time of settlement.

45. At the time of settlement, however, an available balance *does not change at all* for these transactions previously authorized into good funds. As such, Centerstate cannot then charge an OD Fee on such transaction because the available balance has not been rendered insufficient due to the pseudo-event of settlement.

46. Upon information and belief, something more is going on: at the moment a debit card transaction is getting ready to settle, Centerstate does something new and unexpected, during the middle of the night, during its nightly batch posting process. Specifically, Centerstate releases the hold placed on funds for the transaction for a split second, putting money back into the account, then re-debits the same transaction a second time.

47. This secret step allows Centerstate to charge OD Fees on transactions that never should have caused an overdraft—transactions that were authorized into sufficient funds, and for which Centerstate specifically set aside money to pay them.

48. This discrepancy between Centerstate's actual practices and the contract causes accountholders to incur more OD Fees than they should.

49. In sum, there is a huge gap between Centerstate's practices as described in the account documents and Centerstate's practices in reality.

**D.  Centerstate Abuses Contractual Discretion**

50. Centerstate's treatment of debit card transactions to charge OD Fees is not simply a breach of the express terms of the numerous account documents. In addition, Centerstate exploits contractual discretion to the detriment of accountholders when it uses these policies.

51. The terms "hold" or "temporary hold" are interpreted by Centerstate in a surprising, counterintuitive way. Centerstate uses its discretion to define these terms in a manner contrary to any reasonable, common sense understanding of that term.

52. Moreover, Centerstate uses its contractual discretion to cause APPSN Transactions to incur OD Fees by knowingly authorizing later transactions that it allows to consume available funds previously sequestered for APPSN Transactions.

53. Centerstate uses these contractual discretion points unfairly to extract OD Fees on transactions that no reasonable accountholder would believe could cause OD Fees.

**E.  Reasonable Accountholders Understand Debit Card Transactions are Debited Immediately**

54. The assessment of OD Fees on APPSN Transactions is fundamentally inconsistent with immediate withdrawal of funds for debit card transactions. That is because if funds are immediately debited, they cannot be depleted by intervening transactions (and it is that subsequent depletion that is the necessary condition of APPSN Transactions). If funds are immediately debited, then, they are necessarily applied to the debit card transactions for which they are debited.

55. Centerstate was and is aware that this is precisely how accountholders reasonably

understand debit card transactions to work.

56. Centerstate knows that many accountholders prefer debit cards for these very reasons. Research indicates that accountholders prefer debit cards as a budgeting device because they don't allow debt like credit cards do, and because the money comes directly out of a checking account.

57. Consumer Action, a national nonprofit consumer education and advocacy organization, advises consumers determining whether they should use a debit card that "[t]here is no grace period on debit card purchases the way there is on credit card purchases; the money is immediately deducted from your checking account. Also, when you use a debit card you lose the one or two days of 'float' time that a check usually takes to clear." *What Do I Need to Know About Using a Debit Card?*, ConsumerAction (Jan. 14, 2019), https://www.consumer-action.org/helpdesk/articles/what_do_i_need_to_know_about_using_a_debit_card.

58. Further, Consumer Action informs consumers that "Debit cards offer the convenience of paying with plastic without the risk of overspending. When you use a debit card, you do not get a monthly bill. You also avoid the finance charges and debt that can come with a credit card if not paid off in full." *Understanding Debit Cards*, ConsumerAction, http://www.consumer-action.org/english/articles/understanding_debit_cards (last visited April 5, 2020).

59. This understanding is a large part of the reason that debit cards have risen in popularity. The number of terminals that accept debit cards in the United States has increased by approximately 1.4 million in the last five years, and with that increasing ubiquity, consumers have (along with credit cards) viewed debit cards "as a more convenient option than refilling their wallets with cash from an ATM." Maria LaMagna, *Debit Cards Gaining on Case for Smallest*

*Purchases,* MarketWatch, Mar. 23, 2016, http://www.marketwatch.com/story/more-people-are-using-debit-cards-to-buy-a-pack-of-gum-2016-03-23.

60. Not only have accountholders increasingly transitioned from cash to debit cards, but they believe that a debit card purchase is the fundamental equivalent of a cash purchase, with the swipe of a card equating to handing over cash, permanently and irreversibly.

61. Centerstate was aware of a accountholder perception that debit transactions reduce an available balance *in a specified order*—namely, the moment they are actually initiated—and its account agreement only supports this perception.

### F. Plaintiff's Debit Card Transactions

62. As an example, on June 19, 2019, Plaintiff was assessed an OD Fee in the amount of $35.00 for a debit card transaction that settled on that day, despite the fact that positive funds were deducted immediately, on June 17, 2019, for the transaction on which Plaintiff was assessed OD Fees.

## II. CLASS ACTION ALLEGATIONS

63. Plaintiff brings this action on behalf of itself and on behalf of all others similarly situated pursuant to F.R.C.P. 23. The Class is defined as:

> All Centerstate accountholders who, within the applicable statute of limitations preceding the filing of this lawsuit, were charged OD Fees on APPSN Transactions (the "Class").

64. Excluded from the Class are Defendant, Defendant's subsidiaries and affiliates, their officers, directors and member of their immediate families and any entity in which Defendant has a controlling interest, the legal representatives, heirs, successors or assigns of any such excluded party, the judicial officer(s) to whom this action is assigned, and the members of their immediate families.

65. Plaintiff reserves the right to modify or amend the definition of the proposed Class and/or to add a subclass(es), if necessary, before this Court determines whether certification is appropriate.

66. The questions here are ones of common or general interest such that there is a well-defined community of interest among the members of the Class. These questions predominate over questions that may affect only individual class members because Centerstate has acted on grounds generally applicable to the class. Such common legal or factual questions include, but are not limited to:

   a) Whether Centerstate improperly charged OD Fees on APPSN Transactions;

   b) Whether the conduct enumerated above violates the contract;

   c) Whether the conduct enumerated above violates the covenant of good faith and fair dealing;

   d) The appropriate measure of damages.

67. The parties are numerous such that joinder is impracticable. Upon information and belief, and subject to class discovery, the Class consist of thousands of members or more, the identity of whom are within the exclusive knowledge of and can be ascertained only by resort to Centerstate's records. Centerstate has the administrative capability through its computer systems and other records to identify all members of the Class, and such specific information is not otherwise available to Plaintiff.

68. It is impracticable to bring members' of the Class individual claims before the Court. Class treatment permits a large number of similarly situated persons or entities to prosecute their common claims in a single forum simultaneously, efficiently and without the unnecessary duplication of evidence, effort, expense, or the possibility of inconsistent or contradictory judgments that numerous individual actions would engender. The benefits of the class mechanism,

including providing injured persons or entities with a method for obtaining redress on claims that might not be practicable to pursue individually, substantially outweigh any difficulties that may arise in the management of this class action.

69. Plaintiff's claims are typical of the claims of the other members of the Class in that they arise out of the same wrongful business practices by Centerstate, as described herein.

70. Plaintiff is more than an adequate representative of the Class in that Plaintiff is an Centerstate checking account and have suffered damages as a result of Centerstate's contract violations. In addition:

   a) Plaintiff is committed to the vigorous prosecution of this action on behalf of itself and all others similarly situated and have retained competent counsel experienced in the prosecution of class actions and, in particular, class actions on behalf of accountholders against financial institutions;

   b) There is no conflict of interest between Plaintiff and the unnamed members of the Class;

   c) Plaintiff anticipates no difficulty in the management of this litigation as a class action; and

   d) Plaintiff's legal counsel has the financial and legal resources to meet the substantial costs and legal issues associated with this type of litigation.

71. Plaintiff knows of no difficulty to be encountered in the maintenance of this action that would preclude its maintenance as a class action.

72. Centerstate has acted or refused to act on grounds generally applicable to the class, thereby making appropriate corresponding declaratory relief with respect to the Class as a whole.

73. All conditions precedent to bringing this action have been satisfied and/or waived.

## CAUSE OF ACTION
## BREACH OF CONTRACT INCLUDING THE
## COVENANT OF GOOD FAITH AND FAIR DEALING
### (Individually and on Behalf of the Class)

74. Plaintiff repeats and incorporates all of the preceding allegations as if fully set forth herein.

75. Plaintiff, and all members of the proposed Class contracted with Centerstate for checking account services, including debit card services.

76. The Deposit Agreement states that Florida law applies.

77. Centerstate breached promises made to Plaintiff and all members of the proposed class when as described herein, Centerstate charged OD Fees as a result of transactions that did not overdraw a checking account.

78. In addition, under Florida law, there exists an implied covenant of good faith and fair dealing in all contracts that neither party shall do anything which will have the effect of destroying or injuring he right of the other party to receive the fruits of the contract. Good faith and fair dealing, in connection with executing contracts and discharging performance and other duties according to their terms, means preserving the spirit – not merely the letter – of the bargain. Put differently, the parties to a contract are mutually obligated to comply with the substance of their contract in addition to its form. Evading the spirit of the bargain and abusing the power to specify terms constitute examples of bad faith in the performance of contracts.

79. Subterfuge and evasion violate the obligation of good faith in performance even when an actor believes their conduct to be justified. Bad faith may be overt or may consist of inaction, and fair dealing may require more than honesty. Examples of bad faith are evasion of the spirit of the bargain, willful rendering of imperfect performance, abuse of a power to specify terms, and interference with or failure to cooperate in the other party's performance.

80. The implied covenant of good faith and fair dealing applies to the performance and enforcement of contracts, limits the parties' conduct when their contract defers decision on a particular term, omits terms, or provides ambiguous terms.

81. Centerstate has breached the covenant of good faith and fair dealing and abused its discretion in its contract as described herein. Specifically, Centerstate should not have used its discretion to charge OD Fees on APPSN Transactions. The Deposit Agreements a contract term

permitting OD Fees on such transactions, and that contract is otherwise ambiguous as to any right for Centerstate to charge OD Fees on APPSN Transactions.

82. Plaintiff and all members of the proposed Class have performed all, or substantially all, of the obligations imposed on them under the contract.

83. Plaintiff and all members of the proposed Class have sustained damages as a result of Centerstate's breach of the contract and breach of the duty of good faith and fair dealing.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of the Class, demands a jury trial on all claims so triable and judgment as follows:

A. Certification for this matter to proceed as a class action on behalf of the Class;

B. Declaring Centerstate's OD Fee policies and practices to be in breach of its contract with accountholders;

C. Restitution of all OD Fees paid to Centerstate by Plaintiff and the members of the Class, as a result of the wrongs alleged herein in an amount to be determined at trial;

D. Actual damages in an amount according to proof;

E. Pre-judgment and post-judgment interest at the maximum rate permitted by applicable law;

F. For costs and attorneys' fees under the common fund doctrine, and all other applicable law; and

G. Such other relief as this Court deems just and proper.

## DEMAND FOR JURY TRIAL

Plaintiff, on behalf of itself and the Class, hereby demands a trial by jury on all claims so triable.

Dated: April 6, 2020               Respectfully submitted,

*/s/ Jeffrey Ostrow*
Jeffrey Ostrow FBN 121452
Jonathan M. Streisfeld FBN 121452
Daniel Tropin FBN 100424
**KOPELOWITZ OSTROW**

**FERGUSON WEISELBERG GILBERT**
One West Las Olas Blvd., Suite 500
Fort Lauderdale, Florida 33301
Telephone: 954-525-4100
ostrow@kolawyers.com
streisfeld@kolawyers.com
tropin@kolawyers.com

Jeffrey Kaliel (*pro hac vice* to be filed)
Sophia Gold (*pro hac vice* to be filed)
**KALIEL PLLC**
1875 Connecticut Ave. NW 10th Floor
Washington, D.C. 20009
Tel: (202) 350-4783
jkaliel@kalielpllc.com
sgold@kalielpllc.com

*Counsel for Plaintiff and the Class*