# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# JACKSONVILLE DIVISION

|  |  |
|---|---|
| PRECISION ROOFING OF N. FLORIDA, INC., individually and on behalf of all others similarly situated,<br><br>    Plaintiff,<br><br>vs.<br><br>CENTERSTATE BANK,<br><br>    Defendant. | Case No.: 3:20-cv-352-BJD-JRK |

## PLAINTIFF'S EXPERT REPORT OF ARTHUR OLSEN

Plaintiff hereby discloses Arthur Olsen as its expert in support of class certification.  For this Expert Report, Mr. Olsen states as follows:

## INTRODUCTION

1.      I am a data and database expert, with vast experience utilizing data from bank and credit union systems and databases in order to perform various damage calculations.  I have been retained by Plaintiff's counsel as an expert to provide database analysis, data extraction and analysis, and damage calculations in connection with the above-captioned action, and to testify at deposition and trial as necessary.  As part of that assignment, I have been asked to provide my opinions on whether CenterState Bank ("CenterState" or "Defendant") has sufficient historical accountholder transaction data to allow me to ascertain class members and calculate individual damages for each of the class members under the theory being advanced by Plaintiff if the case is certified.

2.      For this case, I have reviewed the Class Action Complaint and the deposition transcripts of Defendant's corporate representative Matt Bazo.  I have also reviewed a number of exemplar data files produced by CenterState that covered a two-month period for all accountholders, including Plaintiff.  Based on the work I have performed in the past, as well as the documents that I have reviewed in this case, my opinion is that if the class is certified and historical CenterState accountholder transaction data is made available to me, I will be able to ascertain the class members and calculate damages for each of the class members under Plaintiff's theory of liability.

3.      I am being compensated for my work on this case at the rate of $350 per hour.  None of my compensation is contingent or based on the content of my opinions or the outcome of this matter.

## QUALIFICATIONS

4.      I am the principal of Cassis Technology, LLC ("Cassis"), an information technology ("IT") consulting firm, and have approximately 25 years of professional experience in the IT field, specializing in the areas of data extraction and analysis, database development, and database administration and support.  My qualifications and background are set forth in my consultant profile ("Profile") attached hereto as **Exhibit A**.  A list of the cases in which I have offered testimony in the past four years, either at trial or by deposition, is attached hereto as **Exhibit B**.

5.      Prior to starting Cassis, I worked as a database engineer for Microsoft Corporation ("Microsoft"), and also worked under contract as a database administrator, developer, and administration support specialist for Hewlett-Packard Company ("Hewlett-Packard").  At Microsoft, I participated in the design, implementation, and support of an extensive data

warehousing solution for Microsoft's licensing division, managed and supported numerous databases throughout the company, and received Microsoft's award for operational excellence for my database-related work.  At Hewlett-Packard, I served as the primary database administrator for both Oracle and SQL Server systems that supported multiple Hewlett-Packard divisions, and also served as the lead analyst in charge of compiling, analyzing, and processing data from various internal database systems throughout Hewlett-Packard for use in litigation support.

6.      In addition to my work for Microsoft and Hewlett-Packard, I have provided database services to several large corporations, including, but not limited to, Cisco Systems, Inc., Tessera Technologies, Inc., and Marvell Technology Group.  My responsibilities in that regard have included integrating various internal database systems for a variety of purposes, including but not limited to: (a) corporate financial reporting services; (b) Sarbanes-Oxley compliance; and (c) corporate mergers and acquisitions.  I have also managed the development of data integration solutions for small to mid-size companies and developed a solution for integrating an automated process for the calculation of inventory reserves with Oracle Financials.

7.      Since 2008, I have extensive experience working on a number of overdraft litigation consulting projects involving financial institutions.  For example, I previously provided trial testimony and was qualified as an expert witness in a consumer lawsuit against Wells Fargo relating to its overdraft practices and fees, which ultimately resulted in a judgment of $203 million against Wells Fargo.  *See Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp. 2d 1080 (N.D. Cal. 2010).

8.      In *Gutierrez*, I was asked to review and analyze the historical transactional data maintained by Wells Fargo, and to provide my opinion regarding the feasibility of using such data to recreate alternative posting orders for the accountholders' transactions (*i.e.*, where the same

transactions are sequenced in a different order than the bank actually posted them) for the purpose of comparing the number of overdraft charges Wells Fargo assessed each accountholder pursuant to its actual posting order with the number of overdraft charges Wells Fargo would have assessed had the alternative posting orders been used.  Having determined that it was, in fact, feasible to do so on an automated basis using the available data, I was ultimately asked to perform calculations using class-wide data to: (a) identify the Wells Fargo California accountholders who were assessed additional overdraft fees due to Wells Fargo's high-to-low posting order (as compared with certain alternative posting orders) during the class period in that case (November 15, 2004 through June 30, 2008); and (b) calculate the amount of the additional overdraft charges each such accountholder was charged during that time period.

9.     After I completed my comprehensive analysis and it was provided to Wells Fargo in advance of trial, Wells Fargo sought to exclude my analysis from trial, submitting competing expert testimony and raising various challenges to my qualifications and the methodology that I used to perform my analysis.  Judge Alsup rejected Wells Fargo's attacks on my methodology, and found that, given my background and experience, I was "clearly qualified to perform" the tasks I was asked to perform.

10.     I presented my comprehensive analyses at the bench trial in *Gutierrez* on April 29, 2010.  I was subjected to cross-examination by Wells Fargo's counsel during the trial.  Moreover, Wells Fargo presented competing testimony from its own experts, who attempted to challenge my methodology and the reliability of my results.

11.     After trial, Wells Fargo submitted proposed findings to the Court.  In its proposed findings, Wells Fargo again sought to discredit my analysis and the methodology that I used.

12.     On August 10, 2010, Judge Alsup issued his findings in *Gutierrez*. Judge Alsup found that I did "a professional and careful job in laying out the impacts of various alternative posting protocols," and adopted one of my analyses as the basis for his $203 million class restitution award:

> This order finds that plaintiffs' expert Arthur Olsen has convincingly shown that it is entirely practical to re-run the computerized data in storage for each class members' account and determine how many overdrafts were added by the high-to-low practice for debit-card transactions during the class period.  Indeed, he has already done so, using various alternate posting sequences.  This has been done by him on an account-by-account, day-by-day, and transaction-by-transaction basis, using the bank's own real-world data.  Court orders were needed to provide him access to this data, but-after much work and time-this order finds that Expert Olsen has done a professional and careful job in laying out the impacts of various alternative posting protocols.  This work has not only demonstrated the enormous impact of the high-to-low scheme, but it has demonstrated that it is possible, in considering relief and restitution, to add back to depositors' specific accounts the amounts that were wrongfully taken by Wells Fargo, using posting protocols that this order finds would have tracked the ordinary and reasonable expectations of depositors.

*Gutierrez*, 730 F. Supp. 2d at 1138.

13.     After multiple appeals, these findings were upheld and the matter was finally concluded on April 4, 2016, when the U.S. Supreme Court declined Wells Fargo's request to review its loss at trial.

14.     In addition, I have been the principal data and damages expert for the plaintiffs in a number of cases included in the massive multi-district litigation, *In re Checking Account Overdraft Litigation*, MDL No. 2036 ("Overdraft MDL").  In connection with my work in the Overdraft MDL, I have analyzed historical transaction data from over thirty of the largest banks in the United States, including, but not limited to:  BancorpSouth, Bank of America, Capital One, Chase, Comerica, Compass, Great Western, PNC, RBC Bank, RBS Citizens, TD Bank, Union Bank, US Bank, Wachovia, and Wells Fargo.  In each of those cases, I analyzed the historical

transaction data in order to advise the court on the feasibility of using such data to ascertain damaged class members and to calculate individual damages for those class members and/or to actually perform those calculations using bank data in connection with a settlement and distribution of the settlement proceeds.  For settlement cases, I first had to calculate which accountholders had been harmed, and then the total amount of harm for each accountholder, before then performing the pro rata recovery calculations for each harmed class member from the settlement fund.  In each case, I was able to perform these tasks, and I have submitted numerous declarations in support of class certification and final approval motions.

15.     In the *Union Bank* case, for example, in a contested class certification motion, the court specifically referenced my declaration in its class certification order, noting that Union Bank did not dispute my "ability to calculate damages on an account-by-account basis using the bank's own computerized records, a method upon which Mr. Olsen previously relied, with court approval, in *Gutierrez v. Wells Fargo Bank, N.A.*" *In re Checking Account Overdraft Litig.*, 275 F.R.D. 666, 673 (S.D. Fla. 2011).

16.     In another instance, I submitted a declaration in support of the plaintiffs' contested class certification motion against *Capital One*.  In response, Capital One filed a motion to exclude my testimony.  In rejecting that motion, the court found that my damages methodology did not offend the *Daubert* reliability standard such that my damages testimony/methodology should be excluded.  *See* June 15, 2012 Order Denying Motion to Exclude, p. 3, Dkt. No. 2768 attached as **Exhibit C**.  The court then certified the class, finding that:

> Plaintiffs propose to have their expert, Mr. Arthur Olsen, mine Capital One's data to determine who the members of the class are.  This method of determining class membership has been accepted by this and other courts on a number of occasions.

> Plaintiffs' expert, Mr. Olsen, can determine with precision who the members of the class are using the Bank's own data.

Plaintiffs have shown that for each permutation, the resulting damages can be calculated by Mr. Olsen.

*See* August 29, 2012 Order Granting Class Certification, pp. 7-8, Dkt. No. 2920 attached hereto as

**Exhibit D**.

17.     Before going to trial, both the *Union Bank* case and the *Capital One* case settled, and in connection with the approval and distribution of the settlements, I was asked to perform the analysis on the entire class of bank accountholders that I had indicated in my class certification reports that I could do once I was provided with class-wide data.  Once that data was provided to me, I performed each analysis, and in both cases, I was able to ascertain each accountholder that had been damaged under the posting order theory advanced by the plaintiffs, and the total amount of harm suffered by each of those accountholders.  In other words, I was able to demonstrate once I received the data that my opinions provided in the class certification reports were accurate.  I have successfully performed numerous similar analyses involving other banks' accountholder transaction data.  I was able to perform those analyses using the same general analysis techniques that would be employed in this case using the same types of data.

18.     In addition to performing analyses relating to re-sequencing of transactions from high-to-low, over the last decade I have been retained on numerous occasions to perform analyses in cases where the claimed improper practice was charging overdraft fees based on available balance rather than ledger or collected balance, charging overdraft fees assessed on debit card transactions previously authorized to a positive available balance, and/or charging multiple fees on ACH debits and checks submitted for payment multiple times.  I have been able to successfully perform those analyses in the litigation and settlement context using full accountholder data by writing code that ascertained each class member that was harmed by the practice and the total amount of harm caused by that practice.  For example, I analyzed the plaintiff's data in the case of

*Faris v. Flagstar Bank, FSB*, Oakland County, Michigan Circuit Court, Case No. 15-145287-CZ, in support of class certification. After the class was certified I analyzed several years of data for all Flagstar accountholders, in order to ascertain the approximately 60,000 members of the class harmed by the bank's use of available balance in assessing overdraft fees. I was also able to determine the amount of harm suffered by each class member. I was retained to testify at trial in June of 2016, but the case was eventually settled.

19.     Since 2008, I have analyzed the accountholder transaction data originating from over 100 different financial institutions. In every one of those instances, the financial institution was able to produce the accountholder transaction data in a usable format, and the data produced contained the information necessary to ascertain the class members and calculate individual damages for each of the class members under the theories being advanced by Plaintiff.

## ASSIGNMENT

20.     My initial assignment in this case was to review certain historical accountholder transactional data that CenterState has maintained to determine the feasibility of using such data to: (a) identify those CenterState accountholders who were harmed (*i.e.*, assessed overdraft fees on debit card transactions previously authorized to a positive available balance); and (b) calculate the amount of harm (*i.e.*, additional fees) each such accountholder incurred as a result of such practice.

21.     I was also asked to review the sample data provided by CenterState in order to determine whether or not: (a) Plaintiff was assessed at least one overdraft fee on a debit card transaction previously authorized to a positive available balance; and (b) the sample data produced by CenterState shows that other accountholders were also assessed overdraft fees on debit card transactions previously authorized to a positive available balance.

22.     My assignments were provided by Plaintiff's counsel.  While I have significant experience in performing damage calculations in these types of cases, my assignment did not include a request to provide my opinion on the appropriateness of any of CenterState's practices. I also was not asked to provide my opinion on the legal or appropriate way to calculate damages for the class.  I have and will rely on Plaintiff's counsel and the Court to provide me the parameters of the analysis to include relevant beginning and ending dates and what constitutes an instance of harm.  My assignment is then to take those parameters and to perform the calculations on the data to ascertain and list those accountholders who have been harmed under Plaintiff's theory of liability, and to calculate the total amount of harm for each accountholder.  I do understand that the theory of liability in this case is that CenterState's contract with its accountholders did not permit CenterState to charge an overdraft fee on a debit card transaction previously authorized to a positive available balance.

## INFORMATION PROVIDED AND UTILIZED
## IN CARRYING OUT MY ASSIGNMENT

23.     CenterState used the FIS software program "Horizon" as its core processing system during the relevant time period.  It was the program that performed the processing and posting of transactions based on inputs provided by CenterState.  As part of normal banking operations, Horizon produced a number of daily reports and those reports have been copied into an FIS cold-storage retention system called "Image Center," which is the archival system where historical data is retained for access as would be utilized in this case.

24.     While the work in *Gutierrez* on the Wells Fargo data was performed on data originating from the Hogan core processing system, and CenterState used the Horizon system, each of these two systems are very similar and provide comparable data and reports.

25.     The report data from the Image Center archival system is the source from which the data necessary to perform my assignments will be extracted.  In his deposition (taken on June 25, 2021, and continued on August 18, 2021), Matt Bazo confirmed that for the relevant time period, CenterState has all of the historical accountholder transactional data in its Image Center archival system needed to carry out my assignment, as more specifically set out below, and that this data could be extracted and made available.

26.     In connection with my assignment in this litigation, I have reviewed the Class Action Complaint and the deposition transcripts of CenterState's corporate representative Matt Bazo, who was designated by CenterState to provided testimony on behalf of CenterState regarding the available historical accountholder data maintained by CenterState.  Through his testimony, Mr. Bazo demonstrated he has a thorough understanding of the CenterState data available for production if the case is certified.  Plaintiff's counsel examined Mr. Bazo regarding sample data originating from a number of underlying reports relating to accountholder transactions that CenterState had produced, all of which confirms that the data and information is available for me to perform a class-wide analysis should the Court certify a class.  The sample data produced is for the months of May and June, 2019.  Specifically, the following reports could be utilized to perform an analysis in this case:

   a.  TF2015DDP1 ("Decisional Report") – This report contains information about all transactions that resulted in either an overdraft fee (*i.e.,* a fee assessed on a transaction that was paid into overdraft) or an insufficient funds fee ("NSF") (*i.e.,* a fee assessed on a transaction that was returned unpaid).  This report includes the following relevant fields:

      i.  Account number of the accountholder;

      ii.  Posting date;

     iii.  Transaction code, which is a unique code used to distinguish between all of the different types of debits that may have caused a fee, including checks, ACH, ATM, and debit card transactions;

     iv.  Transaction amount;

      v.  Fee amount, which would reflect a zero if the fee was waived or not otherwise assessed; and

     vi.  Fee type, either overdraft or NSF.

b.  NBR1TRNDTL and NBR1TRNDT2 (collectively "Transaction Detail") – This data includes information for all posted transactions, and includes the following relevant fields:

      i.  Account number of the accountholder;

     ii.  Posting date;

     iii.  Transaction code, which is a unique code used to distinguish between all of the different types of transactions that may be posted on a day, including deposits, transfers, fees, checks, ACH, ATM, debit card transactions, refunds, and charged off negative balances;

     iv.  Transaction amount;

      v.  Transaction description, which includes merchant name; and

     vi.  Date and time of authorization for debit card transactions.

c.  ICPENDDB ("Pending Debit Journal") – This data includes information for all pre-authorized debit card transactions, and includes the following relevant fields:

      i.  Account number of the accountholder;

     ii.  Posting date;

   iii.  Authorization number;

   iv.  Authorization date and time;

    v.  Transaction amount; and

   vi.  Available balance in the account at the time of authorization.

## **CONCLUSIONS**

27.    Between my prior experience in serving as an expert in similar cases, the case documents and sample data files that I have reviewed, and the testimony of Mr. Bazo, I am confident that CenterState currently retains all of the accountholder data that I would need to ascertain accountholders who were harmed under Plaintiff's theory of liability, and the total amount of harm for each accountholder.  If class-wide data is produced in this case, I will be able to extract information from the data in the same way that I have extracted information from the sample data that will enable me to ascertain class members and calculate the total amount of fees assessed to each accountholder as a result of the claimed improper practice as requested by counsel or the Court.

28.    Using the data, I will use computer code to: (a) ascertain each accountholder who was harmed by CenterState's practice of assessing overdraft fees on debit card transactions previously authorized to a positive available balance; and (b) calculate the amount of harm (*i.e.*, additional fees) each such accountholder incurred as a result of such practice.  This process would be performed by use of an algorithm that will perform the calculations in an automated way on the entire accountholder data set and will not require an individual analysis.

29.     I will be able to do that because the sample data that CenterState has already produced for my review is in a form that is usable for such an analysis, is available for all accountholders for the entire proposed class period, and contains the necessary information. Specifically, the data contains for each debit card transaction that resulted in an overdraft fee:

     a.  The account number;

     b.  The date of the transaction;

     c.  The type of transaction;

     d.  The amount of the transaction;

     e.  The merchant's name;

     f.  The date and time of authorization;

     g.  The available balance at the time of authorization; and

     h.  The amount of the overdraft fee assessed.

30.     With this information, I will identify each debit card transaction that was the subject of an overdraft fee that had previously been authorized to a positive available balance.  If there were any such transactions for a given accountholder, that accountholder would be identified as having suffered harm, and I will calculate the total number of such fees for each accountholder. After performing this calculation for all accountholders during the time frame I am provided, I will calculate the total amount of harm for each accountholder.

31.     I would expect certain additional calculations may be necessary in this case, depending on the instructions provided by the parties or the Court.  For instance, I may be instructed to give the bank credit for reversals and/or uncollectibles where an overdraft fee charged was refunded by CenterState or never collected by CenterState.  My analysis would account for these issues, depending on the instructions provided, as discussed below.

32.     In many of the analyses I have conducted across dozens of banks, there has been some way to account for the reduction of harm to account for reversals of fees. Like Wells Fargo Bank in *Gutierrez*, where reversals were not tied to a single transaction, in the CenterState data there is not a way to conclusively relate a reversal to a specific fee for purposes of reducing the damages. In *Gutierrez*, that was accounted for by the bank giving credit for all reversals in the 30 days following an instance of harm as an offset to damages. I have also used the LIFO method, where a reversal is tied to the last fee assessed. If that fee was identified as harm, the reversal would reduce the damages. However the Court decides reversals should be handled, I can write automated code to ascertain class members and calculate the amount of their harm after a reduction for reversals.

33.     If the parties or the Court want to include an offset for an account closed with a negative balance to the claim of harm, that information is available, and I can include that in my analysis. It is commonly referred to as uncollectibles. In previous cases, the parties often disagreed on whether that should be included in the damage analysis. If there is a decision that it should be included, I can write automated code to ascertain class members and calculate the amount of their harm after a reduction for uncollectibles.

34.     As described above, in connection with my work in this litigation, I was provided access to data for accounts and transactions for a two month period (May and June 2019). Based on my review of that limited sample, Plaintiff incurred harm as a result of CenterState's practice of assessing debit card transactions previously authorized to a positive available balance. For the Court's benefit, I offer the example that Plaintiff was assessed an overdraft fee in the amount of $35 for a debit card transaction at an Olive Garden in the amount of $86.72 that settled on June 19, 2019. The data reflects that this transaction was initially authorized on 6/17/2019 at 8:08:21

PM, and at that time, the available balance in the account was $2,225.12 *after* the authorization of this particular transaction.

36.     I have observed from my review of the sample data that numerous other CenterState accountholders incurred harm as a result of CenterState's practice of assessing overdraft fees on debit card transactions previously authorized to a positive available balance.

36.     My opinions in this report are based upon my extensive experience in the IT field and my prior work as a data management expert in other cases.  I hereby reserve the right to supplement or modify my opinions detailed in this report to the extent that new information and data is made available through discovery or other means.


I declare under penalty of perjury under that the foregoing is true and correct.


Executed this 3rd day of September, 2021, at Seattle, Washington.

_____
Arthur Olsen

# EXHIBIT A



# IT CONSULTANT PROFILE:  ARTHUR OLSEN

## BACKGROUND

Specializing in the areas of data analysis, database development, and database administration, Mr. Olsen has nearly 20 years of professional IT experience.  He has a strong background in both Oracle and Microsoft database technologies, with a focus in developing large-scale applications and designing reporting solutions for publicly traded corporations.  Additionally, he has had valuable experience in analyzing and processing massive amounts of data for use in litigation support.

## SKILLS

- ◆ Considerable experience compiling, analyzing and processing data in support of corporate and class-action litigation.
- ◆ Extensive training and experience creating functional designs and logical data models.
- ◆ Proficient in the wide range of database development and administration technologies including:  Microsoft SQL Server; Oracle RDBMS; and Teradata RDBMS.
- ◆ Relevant experience designing, implementing and maintaining large scale database solutions on Oracle and SQL Server, including both online transaction based systems and data warehouses.
- ◆ Reporting specialist with experience developing custom reporting solutions based on financial systems such as Microsoft Dynamics and Oracle Financials, as well as custom applications.

## AWARDS

- ◆ Award for Operational Excellence | Microsoft
  Recognized for outstanding contribution to the design and implementation of the data warehousing solution for the Microsoft Licensing division.

## CERTIFICATIONS

- ◆ Oracle Certified Professional
- ◆ Certified Oracle Database Administrator

## EXPERIENCE

**Data Expert:  Litigation Specialist** | retained by various law firms

- Data expert supporting massive multi-district class action litigation, (MDL No. 2036 – *In Re: Checking Account Overdraft Litigation*).

- Processed and analyzed data in support of class action litigation, (*Arnett v. Bank of America, N.A.*, D. Or. Case No. 3:11-CV-01372).

- Processed and analyzed data in support of class action litigation, (*Sheila I. Hofstetter et. al. v. JP Morgan Chase Bank, N.A.,* N.D. Cal. Case No. CV-10-1313 WHA).

- Processed and analyzed data in support of class action litigation, (*Veronica Gutierrez et. al. v. Wells Fargo Bank, N.A.*, N.D. Cal. Case No. 07-05923 WHA), that resulted in a $203 million class restitution award.

**Database Engineer:  Reporting Specialist** | under contract at various clients

- Developed a custom Chart of Accounts management solution that integrates with Microsoft Great Plains for small to mid-size companies.

- Designed and implemented several custom financial reporting solutions, including one for a Fortune 500 company, based on Microsoft Business Intelligence, MOSS, and Excel Services.

- Architected a solution for a large corporation that integrated with Oracle Financials and automated the process of calculating inventory reserves.

**Database Administrator, Developer & Litigation Support Specialist** | under contract at Hewlett Packard, Cupertino, CA

- Primary Database Administrator responsible for both Oracle and SQL Server support for three divisions, including 20+ applications spread out over a total of 30+ development, test and production servers.

- Lead analyst responsible for compiling, analyzing and processing data from various systems throughout HP for use in litigation support.

- Participated as the principal authority in the composition and implementation of SQL Server database standards across the three divisions, including security models, backup and recovery plans, programming standards, and general database naming conventions.

**Database Engineer** | Microsoft Licensing, Inc., Reno, NV

- Participated in the design, implementation and support of an extensive data warehousing solution for Microsoft's licensing division.  System included nearly twenty data sources and several thousand end users, including select customers who accessed the system remotely via the Internet.

- Developed numerous DTS packages to pull delta information from various source systems, process and denormalize data and push it to one of several data repositories.

- Created and documented plans for database maintenance, backup and recovery, and high availability.

**Database Engineer** | under contract at Microsoft Corporation, Redmond, WA

- Lone Oracle database administrator and general Oracle resource for all teams associated with an enterprise level online end user billing system, including: Management, Development, Testing, Production Support and Infrastructure.

- Primary owner of a 24 x 7 production database that resided on a DEC Alpha failover cluster.

- Designed replication model using Oracle replication to satisfy extensive reporting requirements.

- Tuned SQL statements as written by members of the development team.  Developed PL/SQL triggers, stored procedures, SQL scripts and NT scripts as needed to enhance applications and to correct problems as discovered.

- Acted as liaison between Microsoft and Oracle for all technical issues related to the databases, and between Microsoft and Digital for all technical issues related specifically to the Alpha cluster.


## EDUCATION

- Microsoft Internal Training – Redmond,  WA  | March 2000
  Instructor led SQL Server training, including courses on Database Architecture and Administration, Database Tuning, and Microsoft's TSQL

- ARIS Education Center – Bellevue,  WA | June 1996
  Oracle DBA Program, including courses on Relational Database Design, Database Architecture and Administration, SQL and PL/SQL, Application Tuning, Database Tuning, and Advanced Database Concepts

- University of Washington – Seattle, WA | June 1989
  BA in Business Administration with a concentration in Finance.

# EXHIBIT B

# CASE LIST: ARTHUR OLSEN
## TESTIMONY GIVEN IN DEPOSITION OR AT TRIAL SINCE JANUARY 2016

| Case Name | Filing Date | Case Number | Court |
|---|---|---|---|
| *Corvello v. Wells Fargo Home Mortgage* | 10/20/2010 | 4:10-CV-05072-VC | U.S. District Court, Northern District of California |
| *Hawkins, et al. v. First Tennessee Bank* | 9/6/2011 | CT-004085-11 | Circuit Court of Shelby County, Tennessee |
| *Hernandez, et al. v. Point Loma Credit Union* | 6/18/2013 | 37-2013-00053519-CU-BT-CTL | Superior Court of San Diego County, California |
| *Lusnak, et al. v. Bank of America* | 3/12/2014 | 2:14-cv-01855-GW | U.S. District Court Central District of California |
| *All-South Subcontractors v. Sunbelt Rentals* | 8/22/2014 | 1:14-cv-00124-WLS | U.S. District Court, Middle District of Georgia |
| *Lynch, et al. v. San Diego County Credit Union* | 3/12/2015 | 37-2015-00008551-CU-BT-CTL | Superior Court of San Diego County, California |
| *IN RE: TD Bank, N.A. Debit Card Overdraft Fee Litigation* | Consolidated 4/15/2015 | MDL No. 2613. Civil Action No. 6:15-MN-2613-BHH | U.S. District Court, District of South Carolina |
| *Hunters Run, et al. v. WCA Waste Corporation* | 6/17/2015 | 1:15-cv-151-MW-GRJ | U.S. District Court, Northern District of Florida |
| *Gunter, et al. v. United Federal Credit Union* | 9/21/2015 | 3:15-cv-00483-MMD-WGC | U.S. District Court, District of Nevada |
| *Stathakos, et al. v. Columbia Sportswear* | 10/2/2015 | 4:15-cv-04543-YGR | U.S. District Court Northern District of California |
| *Morrow, et al. v. Carter's, Inc.* | 5/6/2016 | 1:16-cv-01485-ELR | U.S. District Court Northern District of Georgia |

| Case Name | Filing Date | Case Number | Court |
|---|---|---|---|
| *Childress, et al. v. JP Morgan Chase* | 5/31/2016 | 5:16-cv-00298-BO | U.S. District Court Eastern District of North Carolina |
| *Roberts, et al. v. Capital One, N.A.* | 6/22/2016 | 1:16-cv-04841-LGS | U.S. District Court Southern District of New York |
| *Kirkpatrick, et al. v. HomeAway.com* | 6/23/2016 | 1:16-cv-00733-LY | U.S. District Court Western District of Texas |
| *Baker, et al., v. City of Florissant* | 10/31/2016 | 4:16-cv-1693 | U.S. District Court, Eastern District of Missouri |
| *Webb, et al., v. City of Maplewood* | 11/1/2016 | 4:16-cv-1703 | U.S. District Court, Eastern District of Missouri |
| *Liberty Salad, Inc., et al. v. Groundhog Enterprises* | 1/17/2017 | 2:17-cv-00226 | U.S. District Court, Eastern District of Pennsylvania |
| *Hoggard, et. al. v. Nationstar Mortgage* | 1/13/2017 | 1:17cv00099-TK | U.S. District Court, District of Columbia |
| *Custom Hair Design, et al. v. Central Payment* | 8/21/2017 | 8:17-cv-00310 | U.S. District Court, District of Nebraska |
| *Smith, et al. v. Flagstar Bank* | 8/22/2018 | 3:18-CV-05131-WHA | U.S. District Court, Northern District of California |
| *Clark v. Bank of America, N.A.* | 11/29/2018 | 1:18-cv-3672-SAG | U.S. District Court, District of Maryland |
| *Garcia, et al. v. UMB Bank* | 1/15/2019 | 1916-CV01874 | Circuit Court of Jackson County, Missouri |
| *Baker, et al. v. State Farm* | 2/7/2019 | 4:19-cv-00014-CDL | U.S. District Court, Middle District of Georgia |

| Case Name | Filing Date | Case Number | Court |
|---|---|---|---|
| *Blankenship, et al., v. HAPO Community Credit Union* | 2/20/2019 | 19-2-00922-03 | Superior Court of Washington, County of Benton |
| *Howell, et al., v. Eastman Credit Union* | 4/25/2019 | C42517 | Circuit Court for Sullivan County, Tennessee |
| *Walkingstick, et al., v. Simmons Bank* | 5/22/2019 | 6:19-cv-03184-RK | U.S. District Court, Western District of Missouri |
| *Yarski, et al., v. Knoxville TVA Emp Credit Union* | 6/13/2019 | 3-220-19 | Circuit Court of Knox County, Tennessee |
| *Carnley v. Conduent Business Services* | 9/5/2019 | 5:19-cv-01075-XR | U.S. District Court, Western District of Texas |
| *Nguyen, et al., v. Raymond James & Associates, Inc.* | 1/14/2020 | 8:20-cv-195-CEH-AAS | U.S. District Court, Middle District of Florida |

# EXHIBIT C

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### CASE NO. 1:09-MD-02036-JLK

---

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

---

THIS DOCUMENT RELATES TO:
FOURTH TRANCHE ACTIONS

*Steen v. Capital One, N.A.*
E.D. La. Case No. 2:10-cv-01505-JCZ-KWR
S.D. Fla. Case No. 1:10-cv-22058-JLK

---

## ORDER DENYING CAPITAL ONE, N.A.'S MOTION TO EXCLUDE TESTIMONY FROM PLAINTIFFS' EXPERT WITNESS ARTHUR OLSEN

**THIS CAUSE** comes before the Court on Defendant Capital One, N.A.'s Motion to Exclude Testimony from Plaintiffs' Expert Witness Arthur Olsen (the "*Daubert* Motion") (DE #2454), filed February 3, 2012. Plaintiffs responded on May 29, 2012 (DE #2724) and Defendant replied on June 11, 2102 (DE #2751). The Court heard oral argument on a substantially identical *Daubert* challenge to Mr. Olsen's declaration on March 20, 2012, (Tr., at 1–69) (DE #2628), and subsequently denied motions to exclude by TD Bank, BancorpSouth, and PNC Bank, finding that the challenge really goes to the weight to be given Olsen's testimony by the finder of fact, rather than admissibility under *Daubert*. (*See* DE #2569, 2650).[1] Earlier in these MDL proceedings, the Court similarly rejected Union Bank's challenge to Mr. Olsen's testimony

---

[1] At the conclusion of the hearing on TD Bank's *Daubert* Motion to Exclude the Declaration of Mr. Olsen, the Court explained that TD Bank's challenge goes to "the weight of Mr. Olsen's testimony, and does not offend the considerations of *Daubert* as to reliability so as to preclude his testimony." (Tr., at 61:15–20) (DE #2628).

because the bank failed to offer evidence or expert testimony to "dispute Mr. Olsen's ability to calculate damages on an account-by- account basis . . ." *In re Checking Acct. Overdraft Litig.*, 275 F.R.D. 666, 673 (S.D. Fla. 2011) (certifying a class based in part on expert report provided by Olsen). Defendant provides no sound basis as to why this Court should come to a different conclusion here.

Plaintiffs offer Mr. Olsen's testimony in support of their Motion for Class Certification (DE #2313) because his technical expertise in extracting and analyzing data from Defendant's computer databases will identify class members and will assist the trier of fact by calculating the amount of damages under whichever alternative posting the trier of fact selects. Defendant does not challenge Mr. Olsen's qualifications or expertise to mine and analyze the data from Defendant's databases, which is the only task Plaintiffs ask him to perform. Rather, Defendant seeks to exclude Mr. Olsen's declaration because (1) the Bank's own customer transactional data prior to December 11, 2008 would "take an enormous amount of time and resources to complete," and (2) is "based on an incorrect assumption that, in the alternative world Olsen propose to recreate, all factors would remain exactly the same *except* the order in which the transactions were posted and the number of overdraft fees that Capital One would charge." (*Daubert* Motion, at 5–7) (DE #2454).[2] These arguments are similar to those raised by Wells Fargo in its *Daubert* challenge to Olsen's testimony considered and rejected by Judge Alsup in *Gutierrez v. Wells Fargo & Co.*, No. C-07-05923, 2010 LEXIS 29117 (N.D. Cal. Mar. 26, 2010), which correctly determined that Olsen's analysis will assist the Court in deciding Plaintiffs'

---

[2] Defendant also seeks to exclude Olsen's methodology because it relies too heavily on *Gutierrez* and "boils down to a request that the Court take him at his word that a workable methodology could be developed." (*Daubert* Motion, at 7). The Court will not address this argument at length since Olsen's declaration speaks for itself in describing in detail a methodology that was approved in *Gutierrez* and specifically (1) examines customer and transactional data; (2) programs database code to calculate "differentials" comparing Defendants' posting orders; and (3) adjusts for reversals. (*See* Olsen Decl. ¶¶ 9, 15–29, 43–47). Defendant's challenge to this methodology goes to weight and is thus wholly irrelevant to the question of whether Olsen's testimony is admissible under *Daubert*.

Motion for Class Certification because it demonstrates that Plaintiffs are able, on a class-wide basis using the bank's own data, to identify class members and to calculate damages overdraft fees charged as a result of the re-sequencing. *Id.* at *36–37.

Olsen's declaration not only describes in great detail the methodology he developed and used in *Gutierrez*, but uses this same methodology to calculate the amount of excess overdraft fees charged to Plaintiffs using one alternative posting scenario. (*See* Olsen Decl. ¶¶ 9, 15–29, 43–47). Olsen's exemplar calculations of Plaintiffs' damages based on his thorough review of Defendant's own data, (*id.* at 39–41, 43), show that Olsen will be able to perform such calculations class-wide, which is the only damages question before the Court at this class certification stage of the proceedings. Accordingly, it is

**ORDERED, ADJUDGED and DECREED** that Defendant's Motion to Exclude Testimony from Plaintiffs' Expert Witness Arthur Olsen **(DE #2454)**, is hereby **DENIED**. It is further **ORDERED** that Defendant's Renewed Request for Non-Testimonial Hearing on its Motion to Exclude **(DE #2754)** is **DENIED as moot**.

**DONE and ORDERED** in chambers at the James Lawrence King Federal Courthouse in Miami, Florida, this 15th day of June, 2012.

JAMES LAWRENCE KING
UNITED STATES DISTRICT JUDGE
SOUTHERN DISTRICT OF FLORIDA

cc: All Counsel of Record

# EXHIBIT D

Unsealed 8/29/12

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## CASE NO. 1:09-MD-02036-JLK

IN RE: CHECKING ACCOUNT
OVERDRAFT LITIGATION

MDL No. 2036

THIS DOCUMENT RELATES TO:
FOURTH TRANCHE ACTION

*Steen v. Capital One, N.A.*
E.D. La. Case No. 2:10-cv-01505-JCZ-KWR
S.D. Fla. Case No. 1:10-cv-22058-JLK

## ORDER AND OPINION GRANTING CLASS CERTIFICATION

**THIS CAUSE** comes before the Court upon the Plaintiffs' Motion for Class Certification **(DE #2313)** (the "Motion"). The Court has carefully considered the Motion, Response, Reply, as well as the parties' voluminous evidentiary submission and the oral argument of counsel.[1] As announced at the hearing on this matter on June 21, 2012, and for the reasons explained more fully below, the Court grants the Motion.

## INTRODUCTION

Plaintiffs allege that, through the use of specially designed software, Capital One, N.A. (collectively, "Capital One" or the "Bank") engaged in a systematic scheme to extract the greatest possible number of overdraft fees from Plaintiffs and similarly situated Capital One consumers across the country. Capital One allegedly collected millions of dollars in excessive overdraft fees as a result of this systematic scheme, much of it, according to Plaintiffs, from

---

[1] Defendant filed its Response in Opposition **(DE #2462)** on February 6, 2012. Plaintiffs replied on May 29, 2012 **(DE #2726).**



Capital One's most vulnerable customers. To carry out this scheme, Plaintiffs allege that Capital One manipulated debit card transactions by, among other things, employing a bookkeeping device to reduce the number of "buckets" in which transactions were placed and then, within the buckets, posting them from highest-to-lowest dollar amount at the time of posting. Plaintiffs allege that these account manipulations, which Capital One deponents testified were applied in the same manner to all class members as a result of Capital One's standardized computer software, caused funds in customer accounts to be depleted more rapidly, resulting in more overdrafts and, consequently, more overdraft fees. Plaintiffs further allege that, in many instances, overdraft fees were levied at times when, but for Capital One's manipulations, there were sufficient funds in the consumers' accounts to cover the debit transaction. Plaintiffs allege that Capital One did not fairly disclose its manipulations, took active steps to keep elements of this scheme secret, and engaged in these manipulations despite recognizing that the scheme harmed its customers. Capital One disputes that it has manipulated account transactions and that it has committed any violations of law.

Plaintiffs move for certification of their claims for breach of contract and breach of the duty of good faith and fair dealing, unjust enrichment, and unconscionability.

## FACTUAL BACKGROUND

Without making conclusive findings of fact at this preliminary stage, the record appears to indicate the following evidence is material to the Court's class certification analysis.

Capital One is a national bank incorporated in the Commonwealth of Virginia, with its principal place of business in McLean, Virginia. Capital One first became a national bank offering retail banking services to customers in November 2005, when it acquired Hibernia Bank. Capital One has always operated from the same core systems, which handled overdraft and not-sufficient-funds fees for the entire Bank in the same manner. Capital One employs a

two-bucket debit sorting order. The contents of the buckets are predicated on risk to the Bank. Capital One posted the items that reflected cash outlays (*e.g.*, ATM withdrawals) first.[2] When Capital One acquired other banks, it integrated those banks into the policies and procedures of Capital One, standardized them, and merged their data into Capital One's systems.

Capital One and its heritage banks have employed high-to-low posting since the 1990's.[3] This order extracts the greatest possible number of overdraft fees from Capital One customers.[4] By manipulating transaction order in this way, Capital One customers' accounts were depleted more rapidly, resulting in more overdrafts and subsequently, more fees for the Bank. As such, Capital One could turn a single mistake into multiple overdraft fees on a given day. Capital One then took the fee money directly from customers' accounts by offsetting their next deposit.

When Capital One acquired Hibernia Bank in November 2005, Hibernia was already uniformly manipulating the order of its customers' debit transactions pursuant to a standardized scheme that re-sequenced and posted debits each day in the order of largest-to-smallest in dollar amount instead of in the order in which they were authorized.[5]

Capital One understood the revenue-generating impact of utilizing a high-to-low posting order and that its posting order was harmful to customers.[6] In 2006, following the acquisition of Hibernia Bank, Capital One "analyze[d] overdraft fees for the purposes of unassailability, which

---

[2] *See* CO_STN00025928 (Ex. 8 to Class Certification Br.); *see also* Dep. Tr. of T. Stanmeyer (Ex. 1 to Class Certification Br.), at 68:7–69:12, 112:20–113:1.

[3] *See* Dep. Tr. of T. Stanmeyer (Ex. 1 to Class Certification Br.), at 58:22-25.

[4] *Id.* at 130:2-131:6; CO_STN000003991, (Ex. 15 to Class Certification Br.), at 3995 ("Within a bucket, sorting H-L maximizes NSFs – justified as paying most important items first").

[5] *See* Dep. Tr. of T. Stanmeyer (Ex. 1 to Class Certification Br.), at 42:23–45:25.

[6] CO_STN00073206 (Ex. 8 to Class Certification Br.); CO_STN00005581-5584 (Ex 9 to Class Certification Br.) ("Deposit policies have a significant impact on customer experience and on our bottom line"); Dep. Tr. of T. Stanmeyer (Ex. 1 to Class Certification Br.), at 97:5–98:22.

is our internal – internal program or culture around ensuring defensible and customer friendliness and ensuring that all of our practices are defensible in the court of public opinion."[7] Capital One wanted to make sure it could defend its practice of re-ordering transactions from high-to-low to maximize fee revenue – to make sure the practice was "unassailable."[8] Accordingly, Capital One evaluated a number of alternative posting orders, including low-to-high and chronological ordering:

- **Low-to-High** – "maximize[s] our customers' funds." Identified as the "Most customer friendly" and "Easiest to explain," but causing the "Largest economic impact" (about 22%); and

- **Chronological** – "post transactions as they happen during the day, then we maximize customers' funds." Process captures ATM and debit transactions' "natural" order, "makes 'sense' to customers regarding Debit/ATM," and "looks like L-H." [9]

Nonetheless, Capital One rejected these alternatives.[10] Instead, it decided to continue its revenue-enhancing high-to-low posting practice, even though other simpler, more customer-friendly practices existed.[11] Changing posting order "didn't seem [like] the best bang for the buck."[12]

Plaintiffs introduced evidence demonstrating that Capital One's overdraft policies were hidden from its customers. An overdraft limit calculus was applied in the same manner to all

---

[7] Dep. Tr. of T. Stanmeyer (Ex. 1 to Class Certification Br.), at 39:17–40:13.

[8] *Id.* at 70:6–71:2, 127:19–128:16, 141:22–143:2.

[9] CO-STN000004039 (Ex. 14 to Class Certification Br.), at 4041, 4042, 4046; Dep. Tr. of T. Stanmeyer (Ex. 1 to Class Certification Br.), at 17:10–20:5, 115:7–118:9. Capital One looked at these and other posting orders, and rejected them. *Id.* at 117:17–118:9.

[10] Dep. Tr. of T. Stanmeyer (Ex. 1 to Class Certification Br.), at 117:17–118:9.

[11] *See* CO-STN000004039 (Ex. 14 to Class Certification Br.); Dep. Tr. of T. Stanmeyer (Ex. 1 to Class Certification Br.), at 43:2–45:25, 69:3–7, 115:7–118:9 ("[W]e looked at it and decided not to make any changes.").

[12] Dep. Tr. of T. Stanmeyer (Ex. 1 to Class Certification Br.) at 43:18–45:25, 70:6–71:2, 99:2–24, 127:11–18.

Capital One customers via an automated process owned by banking vendor Sheshunoff utilizing a "Matrix" line of credit based on a pre-set algorithm.[13] The evidence supports Plaintiffs' contention that the Bank decided not to advise customers of the existence or the amount of the overdraft limit.[14] Because of the discretion that it believes is built into its agreements with customers, Capital One felt it did not have to inform customers of its Matrix overdraft limit calculus.[15]

## CLASS CERTIFICATION STANDARDS

The Court must undertake a rigorous analysis to insure that the Rule 23 prerequisites are met. *Klay v. Humana, Inc.*, 382 F.3d 1241, 1251 (11th Cir. 2004). In making the decision, the Court does not determine whether plaintiffs will ultimately prevail on the merits, but it may consider the factual record in deciding whether the requirements of Rule 23 are satisfied. *Valley Drug. Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1188 n.15 (11th Cir. 2003).

Courts "formulate some prediction as to how specific issues will play out in order to

---

[13] Dep. Tr. of T. Stanmeyer (Ex. 1 to Class Certification Br.) at 102:16–24, 107:10–108:6; CO_STN00012379 (Ex. 10 to Class Certification Br.), at 12380; Dep. Tr of C. Vanderlofske (Ex. 11 to Class Certification Br.), at 104:10–23.

[14] *See* Dep. Tr. of T. Stanmeyer (Ex. 1 to Class Certification Br.), at 33:7–11 ("[W]e don't make it available to the customer, we don't promise it to the customer, we don't talk about it with the customer. It is simply a service, and -- and for that reason, we can -- we can remove it . . ."); Dep. Tr. of C. Gremillion (Ex. 6 to Class Certification Br.), at 57:2–4.

[15] *See* Dep. Tr. of T. Stanmeyer (Ex. 1 to Class Certification Br.), at 33:19–34:5 ("We do disclose to the customer that we may choose to at our discretion pay items in overdraft as a service to the customer. We do disclose that, but we never disclose how we -- how we -- how we use that discretion."). *See also id.* at 33:4–34:5, 60:24–61:24 ("We disclosed that we have at our discretion the ability to pay items into overdraft, but we never stated that there is a cushion or what the algorithm is for having such a cushion. It's simply the concept that we may pay overdraft items at our discretion is all we've disclosed."); CO_STN00023694 (Ex. 12 to Class Certification Br.). This was true even when one of the legacy banks' customers were converted to the Capital One system. *See* Dep. Tr. of E. Brunken at (Ex. 5 to Class Certification Br.), at 44:1–18 ("we did not inform the customers of the posting order, so it wasn't something that they already knew, therefore, we did not notify them that we were changing.").

determine whether common or individual issues predominate in a given case." *Waste Mgmt. Holdings v. Mowbray*, 208 F.3d 288, 298 (1st Cir. 2000). In other words, the Court undertakes "an analysis of the issues and the nature of required proof at trial to determine whether the matters in dispute and the nature of plaintiffs' proofs are principally individual in nature or are susceptible of common proof equally applicable to all class members." *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 334 (E.D. Mich. 2001) (quoting *Little Caesar Enters., Inc. v. Smith*, 172 F.R.D. 236, 241 (E.D. Mich. 1997)).

Rule 23(a) states that a class may be certified "only if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a). If the Court finds that the class criteria of Rule 23(a) are satisfied, it then must also find that the class fits within one of the three categories in Rule 23(b) in order to certify.

## DISCUSSION

### I.     The Class Definition

Before considering the requirements of Rule 23, the Court must determine whether a class exists that can adequately be defined. *Singer v. AT & T Corp.*, 185 F.R.D. 681, 685 (S.D. Fla. 1998) (citing *DeBremaecker v. Short*, 433 F.2d 733, 734 (5th Cir.1970)). "While the definition of the class must not be vague or difficult to apply, the implicit definition requirement does not require an overly strict degree of certainty and is to be liberally applied." *Id.* Plaintiffs' proposed class consists of:

> All Capital One customers in the United States who, within the applicable statute
> of limitations preceding the filing of this action to August 13, 2010 (the "Class

6

Period"), incurred an overdraft fee as a result of Capital One's practice of re-
sequencing debit card transactions from highest to lowest dollar amount (the
"National Class").

Plaintiffs also seek the certification of subclasses for specific claims as set forth in Plaintiffs'

Proposed Trial Plan for Trial of All Class Claims (the "Trial Plan") **(DE #2314)**. These

subclasses are discussed below.

    Capital One argues that the proposed Class definition does not satisfy the requirements of

Rule 23 because it requires a merits determination, and because the class period is defined by

reference to the applicable statutes of limitation. The Court finds these arguments unpersuasive.

The evidence demonstrates that Class members can be identified from Capital One's own

records. Plaintiffs propose to have their expert, Mr. Arthur Olsen, mine Capital One's data to

determine who the members of the class are. This method of determining class membership has

been accepted by this and other courts on a number of occasions.[16]

    The crux of Capital One's argument is that Plaintiffs have not identified a baseline

posting order for comparison purposes, and thus that the class is not ascertainable. The Bank is

incorrect. Plaintiffs allege that all customers who were charged additional overdraft fees, as

compared to what they would have been charged under a *low-to-high* posting practice, were

---

[16] *See In re Checking Acct. Overdraft Litig.*, 275 F.R.D. 666, 680 (S.D. Fla. 2011)
("*Larsen*"), *pet. for leave to appeal denied*, No. 11-90012 (11th Cir. Oct. 7, 2011) **(DE #1763)**;
Order Denying Motion to Exclude Testimony from Plaintiffs' Expert Witness Arthur Olsen **(DE
#2768)**. *See also, e.g., Sadler v. Midland Credit Mgmt.*, 2009 U.S. Dist. LEXIS 26771, at \*4-5
(N.D. Ill. Mar. 31, 2009) (automated query of defendants' database would yield "objective
criteria" necessary to ascertain the class); *Stern v. AT&T Mobility Corp.*, 2008 U.S. Dist. LEXIS
110305, at \*12-13 (C.D. Cal. Aug. 22, 2008) (defendants' business records provided sufficient
information to identify individuals who purchased cellular telephone service and were enrolled in
either one of the challenged services without ever having requested the service); *In re Diet Drugs
Prods. Liab. Litig.*, 1999 U.S. Dist. LEXIS 13228, at \*34-35 (E.D. Pa. Aug. 26, 1999) (finding
class definition was adequate because there were reliable means to determine who had actually
taken the drug where fact sheets, prescription records, and records of medical treatment were
available to verify consumption); *see also Roper v. Consurve, Inc.*, 578 F.2d 1106 (5th Cir.
1978), *aff'd sub nom. Deposit Guaranty Nat'l Bank v. Roper*, 445 U.S. 326 (1980).

harmed by Capital One's re-ordering scheme. *See* Reply **(DE #2726),** at 21–22, 24. Thus, the members of the Class are those persons who suffered one or more additional overdraft fees from the high-to-low posting order than they would have incurred had the Bank used a low-to-high posting order. More specifically, comparing the results of high-to-low sequencing (which yields the greatest number of overdraft fees) to low-to-high sequencing (which yields the lowest number of overdraft fees) defines the outer parameters of the membership of the proposed class. Plaintiffs' expert, Mr. Olsen, can determine with precision who the members of the class are using the Bank's own data.

The composition of the class, and those persons bound by the judgment, will not vary if the finder of fact ultimately determines that a less consumer-friendly posting order than low-to-high is appropriate, or even if the finder of fact determines that a high-to-low posting order is consistent with the Bank's contractual and other obligations. 7A Wright, Miller & Kane, Federal Practice & Procedure: Civil 3d § 1760 (3d ed. 2005) ("If the general outlines of the membership of the class are determinable at the outset of the litigation, a class will be deemed to exist."). This subsequent determination of the good faith posting order will, if anything, vary only the amount of damages. *Klay*, 382 F.3d at 1259–60 (footnotes omitted) ("[W]here damages can be computed according to some formula, statistical analysis, or other easy or essentially mechanical methods, the fact that damages must be calculated on an individual basis is no impediment to class certification."). Plaintiffs have shown that for each permutation, the resulting damages can be calculated by Mr. Olsen.

Capital One also argues that the class definition is impermissibly vague because its start date is based on the applicable statutes of limitation rather than a specific date. However, courts commonly certify classes with start dates that are linked to the statute of limitations where, as

here, the challenged conduct predates the relevant limitations periods. *See, e.g., Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1263 (11th Cir. 2009) (court did not take issue with definition of class period as beginning with the "commencement of the statute of limitations through the date that the Court certifies this suit as a class action"); *Nelson v. Mead Johnson Nutrition Co.*, 270 F.R.D. 689 (S.D. Fla. 2010) (certifying class defined as "[a]ll Florida consumers who purchased Enfamil® LIPIL® within the applicable statute of limitations."); *North Jackson Pharm., Inc. v. Express Scripts, Inc.*, 2006 U.S. Dist. LEXIS 98774, at *18-20 (N.D. Ala. Mar. 3, 2006) (class certified where class period beginning date was based on when limitation period began to run).

Because class membership is defined by objective criteria, the Court finds that the class is readily ascertainable.

## II.    Rule 23(a)

### A.    Numerosity

The first requirement of Rule 23(a) is that the class must be "so numerous that joinder of all members is impracticable." Fed. R. Civ. P. 23(a)(1). "[A] numerical yardstick is not the determinant for class certification; rather a court should examine the numbers involved to see if joinder of all is impossible or impracticable." *Hastings-Murtagh v. Texas Air Corp.*, 119 F.R.D. 450, 459 (S.D. Fla. 1988). Parties seeking class certification do not need to know the "precise number of class members," but they "must make reasonable estimates with support as to the size of the proposed class." *Fuller v. Becker & Poliakoff, P.A.*, 197 F.R.D. 697, 699 (M.D. Fla. 2000). The Eleventh Circuit has held that "[g]enerally, less than twenty-one is inadequate, more than forty adequate." *Cheney v. Cyberguard Corp.*, 213 F.R.D. 484, 490 (S.D. Fla. 2003) (quoting *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546, 1553 (11th Cir.1986)).

Although the exact number of class members is not presently known, Capital One's

discovery responses indicate that the proposed Class is comprised of hundreds-of-thousands of Capital One customers, making joinder of them all impracticable if not impossible. Capital One has 2.5 million consumer checking accounts,[17] all of which are treated the same regarding overdraft fees. Further, in 2009, when Capital One was considering changes to its overdraft policies, it estimated that 560,000 customers per year would be affected by any change to the way it treated overdraft fees.[18]

Accordingly, the Court finds that the numerosity requirement of Rule 23 is satisfied.

**B.    Commonality and Typicality[19]**

Rule 23(a)'s commonality prerequisite requires that there be at least one issue common to all members of the class. The "commonality" requirement of Rule 23(a)(2) "is a 'low hurdle' easily surmounted." *Rolland v. Patrick*, No. 98-30208, 2008 U.S. Dist. LEXIS 66477, at *12 (D. Mass. Aug. 19, 2008) (citations omitted); *see also Cheney*, 213 F.R.D. at 490 (commonality threshold is "not high"). It only requires "at least one issue common to all class members." *Brown v. SCI Funeral Servs. of Fla., Inc.*, 212 F.R.D. 602, 604 (S.D. Fla. 2003) ("Plaintiffs' legal claims need not be completely identical and factual differences concerning treatment or damages will not defeat a finding of commonality."). The commonality element is generally satisfied when a plaintiff alleges that "[d]efendants have engaged in a standardized course of

---

[17] *See* Dep. Tr. of T. Stanmeyer (Ex. 1 to Class Certification Br.), at 84:21-85:19.

[18] CO-STN0005581 (Ex. 9 to Class Certification Br.)

[19] "The typicality and commonality requirements are distinct but interrelated, as the Supreme Court made clear: 'The commonality and typicality requirements of Rule 23(a) tend to merge. Both serve as guideposts for determining whether under the particular circumstances maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'" *Cooper v. Southern Co.*, 390 F.3d 695, 713 (11th Cir. 2004) (quoting *Gen. Tel. Co. of the Southwest v. Falcon*, 457 U.S. 147, 157 n.13 (1982)), *overruled on other grounds by Ash v. Tyson Foods, Inc.*, 546 U.S. 454, 457 (2006).

conduct that affects all class members." *In re Terazosin Hydrochloride*, 220 F.R.D. 672, 687 (S.D. Fla. 2004); *In re Recoton Corp. Secs. Litig.*, 248 F.R.D. 606, 616, 618 (M.D. Fla. 2006).

Relying on *Wal-Mart Stores, Inc. v. Dukes*, -- U.S. --, 131 S.Ct. 2541 (2011), Capital One contends that Plaintiffs have not satisfied the commonality requirement. In *Dukes*, the Supreme Court decertified a Rule 23(b)(2) class consisting of 1.5 million current and former employees of Wal-Mart. The Court held that the plaintiffs failed to satisfy the commonality requirement because they "provide[d] no convincing proof of a companywide discriminatory pay and promotion policy," *id.* at 2557, and without such proof, it would have been impossible to produce a common answer to the question of why each class member was disfavored, which was the "crux of the inquiry" for the plaintiffs' Title VII claims. *Id.* at 2552.

Unlike the plaintiffs in *Dukes*, Plaintiffs here have provided evidence of a common corporate policy or practice, namely, Capital One's systematic, computerized and uniform manipulation and re-ordering of debit card transactions, its bucket structure, its development and implementation of overdraft limits, and its concealment of its overdraft practices, all to increase the number of overdraft fees imposed. Plaintiffs provided substantial evidence of Capital One's uniform overdraft scheme, thereby satisfying the commonality and typicality standards. "Of course, when a group of plaintiffs suffer under a uniform policy, the commonality test is often satisfied, even after *Dukes*." *Oakley v. Verizon Communications, Inc.*, No. 09-9175, 2012 U.S. Dist. LEXIS 12975, *38 (S.D.N.Y. Feb. 1, 2012). That is the common contention that applies to all class members that drives the resolution of this litigation. *Dukes*, 131 S. Ct. at 2551.

In particular, the common issues of law and fact in this case include whether Capital One:

- Manipulated and re-ordered transactions in order to increase the number of overdraft fees imposed;

- Concealed from class members the limits of their overdraft credit line and the

11

existence of such a limit;

- Concealed from class members the purpose and effect of its "bucket" system in which transactions were grouped in order to minimize risk to the bank and maximize overdraft fees;

- Elected not to alert class members that an ATM withdrawal or debit card transaction would trigger an overdraft fee if processed and not to provide them with an opportunity to cancel the transaction;

- Imposed overdraft fees when, but for re-sequencing, there would be sufficient funds in the account; and

- Delayed posting transactions so that class members were charged overdraft fees even when sufficient funds were in the account to cover the transactions.

The Court finds that, based on the evidence presented, Plaintiffs' claims arise out of the same course of conduct and are based on the same legal theories as those of the absent class members.[20] Pursuant to a standardized, automated process, Capital One posted all debit transactions that settled on a given day late in the evening or early the following morning before business hours. The order in which the Bank posted debit transactions to an account directly corresponded to the order in which the funds were deducted from the account. Throughout the Class Period, as to each Plaintiff and every member of the proposed class, it was Capital One's uniform practice to post all point-of-sale, ATM, and teller debit transactions in one or more "buckets," each in the order of highest-to-lowest dollar amount. That is, all Plaintiffs and members of the proposed class, whose accounts were governed by common and materially uniform agreements, were subjected to Capital One's practice of re-sequencing debit card transactions from high-to-low, and Plaintiffs allege that they and all members of the proposed class were assessed additional overdraft fees as a result. When the finder of fact determines whether Capital One's uniform application of high-to-low reordering, which it applied to all of

---

[20] These facts are referenced in greater detail in the discussion of predominance below.

its customers in the same way, was unlawful, it will thereby "generate [a] common answer" that "will resolve an issue that is central to the validity of [Plaintiffs'] claims in one stroke." *Id.* at 2551.

Capital One's alleged scheme, however, entailed more than just the high-to-low posting order. Plaintiffs contend that Capital One's employment of a two-bucket debit sorting order in which transactions were grouped and its implementation of a secret overdraft limit, in addition to and in conjunction with its invariable high-to-low posting system, all combined to cause more overdrafts and greater revenue for the Bank. These practices too involve common issues which can be established with common proof.

Typicality requires that "the claims or defenses of the representative parties are typical of the claims or defenses of the class." Fed. R. Civ. P. 23(a)(3). The typicality test centers on "whether other members have the same or similar injury, whether the action is based on conduct which is not unique to the named class plaintiffs, and whether other class members have been injured by the same course of conduct." *Hanon v. Data Prods. Corp.*, 976 F.2d 497, 508 (9th Cir. 1992). Although similar to commonality in that it concentrates on the "nexus" between class members and the named class representative, typicality differs from commonality in that it focuses on the named class representative's individual characteristics in comparison to the proposed class. *Piazza v. EBSCO Indus. Co.*, 273 F.3d 1341, 1346 (11th Cir. 2001); *Prado-Steiman v. Bush*, 221 F.3d 1266, 1269 (11th Cir. 2000). Typicality is satisfied where the named plaintiffs' claims "arise from the same event or pattern or practice and are based on the same legal theory" as the claims of the class. *Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984), *cert. denied*, 470 U.S. 1004 (1985); *see also Brown v. SCI Funeral Servs. of Fla., Inc.*, 212 F.R.D. at 604-05; *Pottinger v. Miami*, 720 F. Supp. 955, 959 (S.D. Fla. 1989).

13

"The test for typicality, like commonality, is not demanding." *In re Disposable Contact Lens Antitrust Litig.*, 170 F.R.D. 524, 532 (M.D. Fla. 1996). Neither typicality nor commonality requires that all putative class members share identical claims, and both may be satisfied even if some factual differences exist between the claims of the named representatives and the claims of the class at large. *Appleyard v. Wallace*, 754 F.2d 955, 958 (11th Cir. 1985) (strong similarity is sufficient for typicality, even where factual differences exist). This holds especially true where an action challenges a policy or practice:

> [F]actual differences will not render a claim atypical if the claim arises from the same event or practice or course of conduct that gives rise to the claims of the class members, and if it is based on the same legal theory . . . Indeed, even relatively pronounced factual differences will generally not preclude a finding of typicality where there is a strong similarity of legal theories. Where an action challenges a policy or practice, the named plaintiffs suffering one specific injury from the practice can represent a class suffering other injuries, so long as all the injuries are shown to result from the practice.

*Baby Neal v. Casey*, 43 F. 3d 48, 58 (3d Cir. 1994) (internal quotations and citations omitted). To defeat typicality, the factual variation presented by a class representative's claim "must be clear and must be such that interests of the class are placed in significant jeopardy." *Walco Invs., Inc. v. Thenen*, 168 F.R.D. 315, 326 (S.D. Fla. 1996).

The common issues arising from Capital One's alleged overdraft scheme are shared by Plaintiffs and the class, and there is no factual variation that would place the interests of the class in jeopardy. Courts have regularly found that typicality is satisfied where a defendant has engaged in a common course of misrepresentation or concealment, even where class representatives were not subject to identical contracts. *See Salvagne v. Fairfield Ford, Inc.*, 264 F.R.D. 321, 328 (S.D. Ohio 2009); *Demmick v. Cellco P'ship*, No. 06-2163, 2010 U.S. Dist. LEXIS 94041, at *19–25 (D.N.J. Sept. 8, 2010); *Fischler v. AmSouth Corp.*, 176 F.R.D. 583, 585–86 (M.D. Fla. 1997).

14

Capital One claims that Plaintiffs have different expectations and preferences in posting order and that they cannot be typical of the class. However, it is the defendant's common course of conduct, not the class representatives' subjective expectations or preferences, which govern considerations of typicality. *See Johnson v. GEICO Cas. Co.*, 673 F. Supp. 2d 255, 275–76 (D. Del. 2009); *Marcus v. B.M.W. North Am., L.L.C.*, 2010 U.S. Dist. LEXIS 122908, at *16–17 (D.N.J. Nov. 19, 2010). Plaintiffs and the members of the class are all challenging the same overdraft policies of Capital One and seeking to recover the additional overdraft fees they incurred as a result of Capital One's re-sequencing of their transactions. This is true irrespective of the cause of action alleged.

Capital One contends that Plaintiffs' breach of contract and breach of the covenant of good faith and fair dealing claim requires an assessment of individual expectations. To the extent that expectations are relevant, however, an objective standard governs and thus individual expectations are irrelevant. *See Larsen*, 275 F.R.D. at 680 (holding individual Plaintiffs' and class members' subjective expectations are not necessary to prove their claims; "[t]o the contrary, breach of the covenant good faith and fair dealing may be shown by class-wide evidence of a defendant's subjective bad faith or objectively unreasonable conduct."). Under the Restatement, their knowledge or understanding of the standard terms is immaterial, as is the fact that some customers might have superior knowledge. *See* RESTATEMENT (SECOND) CONTRACTS § 211(2); cmt. (e). This claim can be established by common proof of Capital One's uniform application of high-to-low posting and related devices like the Matrix to the members of the Class and the Bank's concealment of its overdraft practices that affect Plaintiffs and the class alike.

According to Capital One, Plaintiffs' claim for unconscionability is atypical as a result of

individual variations in customer preference and knowledge regarding posting order. Once again, common proof can be used to establish that the conduct alleged by Plaintiffs was uniformly unconscionable. Differences in characteristics such as education, age, experience, and sophistication between Plaintiffs and the class do not render them atypical since, it is undisputed, neither Plaintiffs nor the class were able to negotiate the terms of their agreements with Capital One, rendering any differences in such characteristics insignificant.

Differences in the degree of customer awareness also do not establish atypicality here. Plaintiffs contend that Capital One's concealment of its overdraft policies prevented both Plaintiffs and the class members from gaining sufficient knowledge to understand and appreciate Capital One's scheme and how it affected them. Some customers' knowledge of Capital One's high-to-low posting order alone, without awareness of Capital One's two-bucket sorting order system and the existence and amount of overdraft limit Matrix (information uniformly concealed from customers by Capital One), is not sufficient to bar class certification here. Plaintiffs' contentions and the evidence regarding Capital One's uniform nondisclosure of its overdraft practices render Plaintiffs' unjust enrichment and unfair and unconscionability claims typical. *See Spencer v. Hartford Fin. Servs. Group, Inc.*, 256 F.R.D. 284, 291 (D. Conn. 2009).

Capital One cites supposedly divergent customer preferences to argue that damage calculations will differ, and that the identity of the class members that have been damaged will vary, depending upon the alternative posting order selected. Class membership is discussed above, and will not vary on this basis. Further, as noted above, individual preferences are irrelevant. Differences in the amount of damages suffered by the class representatives and the class do not, of course, affect typicality. *Kornberg*, 741 F.2d at 1337.

Finally, Plaintiffs have proposed discrete multi-state subclasses for some of the state law

16

claims, to ensure that the proposed class representatives' claims are materially identical to all other class members that they seek to represent. The Court addresses the application of these subclasses in Section III(D) below. The subclasses provide additional assurance of typicality here. Therefore, the Court finds that the commonality and typicality requirements are met.

### C.    Adequacy

The Court must be satisfied that the "representative parties will fairly and adequately protect the interests of the class." Fed. R. Civ. P. 23(a)(4). This requirement is satisfied when (i) the class representatives have no interests conflicting with the class; and (ii) the representatives and their attorneys will properly prosecute the case. *Sosna v. Iowa*, 419 U.S. 393, 403 (1975); *Valley Drug Co. v. Geneva Pharms., Inc.*, 350 F.3d 1181, 1189 (11th Cir. 2003). Adequacy exists where the named plaintiffs share common interests with the class members and seek the same type of relief for themselves as they seek for the class. *Pottinger*, 720 F. Supp. at 959.

The Court is satisfied that the named Plaintiffs will fairly and adequately represent the interests of the class and each subclass for which they have been proposed as a representative. The central issues in this case – the existence, unlawfulness and effect of Capital One's scheme to manipulate debit card transactions to increase the number of overdraft fees it could assess – are common to the claims of Plaintiffs and the other members of the class. Based on the evidence in the record regarding named class representatives Ms. Steen and Mr. Menyweather, they, like each and every other absent class member, each have a strong interest in proving Capital One's scheme, establishing its unlawfulness, demonstrating the impact of the illegal conduct and obtaining redress. The named Plaintiffs thus "share the true interests of the class." *Hastings-Murtagh*, 119 F.R.D. at 459; *see also Tefel v. Reno*, 972 F. Supp. 608, 617 (S.D. Fla. 1997) (the

"common goal of each member of the class" is to remedy the unlawful conduct, and "[i]f the Plaintiffs succeed, the benefits will inure to all class members.").

The Court is not persuaded that there exists an intra-class conflict over which alternative posting order should be used to calculate damages. To the extent individual preference with regard to posting order is relevant, there does not appear to be any competent evidence that class members would prefer a high-to-low posting order over any of the possible alternatives, such as chronological or low-to-high. *See Gutierrez v. Wells Fargo Bank, N.A.*, 730 F. Supp.2d 1080, 1105 (N.D. Cal. 2010). If Plaintiffs establish Capital One's liability, the evidence suggests that most if not all class members stand to benefit, regardless of the alternative posting order ultimately chosen by the fact-finder, because almost all of Capital One's overdraft revenue came from a concentrated population of customers. There is no suggestion that Plaintiffs will not properly prosecute this case on behalf of the subclasses.

The Court further finds that Plaintiffs' counsel have no interests that are antagonistic to those of the absent class members and that they have diligently represented their clients and the absent class members. The law firms seeking to represent the class here include very qualified and experienced lawyers. The Court has previously reviewed the firm resumes setting forth their experience and expertise in class actions. In addition, the Court is familiar with many of the lawyers seeking to represent the class, as they have appeared before the Court a number of times in this litigation and in others. The Court is therefore satisfied that the lead Plaintiffs and the firms seeking appointment as class counsel will properly and adequately prosecute this case.

The Court hereby appoints Plaintiffs R. Leanne Steen, a resident and citizen of the State of Louisiana, and Terrance Menyweather, a resident and citizen of the State of Texas, as representatives of the class, and appoints the following firms as class counsel pursuant to Fed. R.

Civ. P. 23(g): Podhurst Orseck, P.A.; Bruce Rogow, P.A.; Grossman Roth, P.A.; Trief & Olk; Baron & Budd, P.C.; Golomb & Honik, P.C.; Lieff Cabraser Heimann & Bernstein LLP; and Webb, Klase & Lemond, L.L.C.

> (i) *A Ten-Year Statute of Limitations Applies to Plaintiff Leanne Steen and All Louisiana Class Members*

Capital One argues that Ms. Steen is not an adequate class representative because she knew Capital One was posting transactions in high-to-low order in 2008, and that because a one-year statute of limitations should be applied, she cannot bring her claims under Louisiana law. This is not the statute of limitations that applies here.

As a preliminary matter, what Ms. Steen knew and to what extent she understood Capital One's scheme is not relevant to the claims at issues, as discussed above. In any event, the law of Louisiana is quite clear that a ten-year "liberative" prescription period should apply in this matter, grounded as it is in obligations arising from a contractual relationship between the parties. *See Richard v. Wal-Mart Stores, Inc.*, 559 F. 3d 341 (5th Cir. 2009) (citing La. Civ. Code Art. 3499 and *Strahan v. Sabine Retirement & Rehab.Center, Inc.*, 981 So. 2d 287, 291 (La. App. 3 Cir. 4/30/08)). Plaintiffs' well-pled breach of express contract claim survived Capital One's challenge and is still a viable cause of action. Further, the express terms of the contract are at issue in this case, since it is these terms that dictated and limited the Bank's discretion to re-order transactions. As the Complaint alleges, the Bank exercised that discretion in bad faith and elected a high-to-low order instead. Accordingly, Louisiana's ten-year statute of limitations applies.[21]

**III.    Rule 23(b)(3)**

Plaintiffs bring this action under Rule 23(b)(3), which requires (i) that questions of law or

---

[21] Because the Court holds that the ten-year statute of limitations applies, the Court need not reach the question of whether the Louisiana doctrines of "continuing tort" and "*contra non valentem*" apply.

fact common to class members predominate over any questions affecting individual members, and (ii) that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

### A.      Predominance

"Common issues of fact and law predominate if they 'have a direct impact on every class member's effort to establish liability and on every class member's entitlement to injunctive and monetary relief.'" *Klay*, 382 F.3d at 1255 (quoting *Ingram v. Coca-Cola Co.*, 200 F.R.D. 685, 699 (N.D. Ga. 2001)); *see also Moore v. Painewebber, Inc.*, 306 F.3d 1247, 1252 (2d Cir. 2002) (common issues predominate "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof."). It is not necessary that all questions of law or fact be common; only some questions must be common, and they must predominate over individual questions. *See Klay*, 382 F.3d at 1254; *see also Allapattah Servs., Inc. v. Exxon Corp.*, 333 F.3d 1248, 1261 (11th Cir. 2003), *aff'd*, 545 U.S. 546 (2005) ("the presence of individualized damages issues does not prevent a finding that the common issues in the case predominate.").

The predominance inquiry focuses on the number and significance of common issues. It does not require a complete absence of individual issues. *Cox v. Am. Cast Iron Pipe Co.*, 784 F.2d 1546 (11th Cir.), *cert. denied*, 479 U.S. 883 (1986). If the liability issue is common to the class, common questions predominate over individual questions. *Singer v. AT & T Corp.*, 185 F.R.D. 681, 690 (S.D. Fla. 1998); *see also Brown v. SCI Funeral Servs. of Fla., Inc.*, 212 F.R.D. at 606 ("In deciding whether common questions predominate under Rule 23(b)(3), courts generally focus on whether there are common liability issues which may be resolved efficiently

on a class-wide basis.") (citation omitted); *Cooper v. Pacific Life Ins. Co.*, 229 F.R.D. 245, 263–64 (S.D. Ga. 2005) (finding predominance satisfied despite "fact that some individual consideration of customers' unique circumstances would have been necessary" to evaluate their claims, where "classwide liability exists, if at all, because of the . . . common course of conduct, through misleading omissions . . . and otherwise.").

Here, "irrespective of the individual issues which may arise, the focus of the litigation" concerns "the alleged common course" of unfair conduct embodied in Capital One's alleged scheme to maximize overdraft fees through the reordering of transactions at account posting. *Sargent v. Genesco, Inc.*, 75 F.R.D. 79, 86 (M.D. Fla. 1977). Any analysis of this scheme will depend on evidence relating to the standardized form account agreement and overdraft practices affecting all class members in a uniform manner. A scheme "perpetrated on numerous persons by the use of similar misrepresentations may be an appealing situation for a class action, and it may remain so despite the need, if liability is found, for separate determination of the damages suffered by individuals within the class." Advisory Committee's Notes to Rule 23(b)(3) (1966 Amendments). Indeed, predominance is "a test readily met in certain cases alleging consumer or securities fraud or violations of the antitrust laws." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625 (1997).

The Court finds that predominance is satisfied in this case. Plaintiffs allege that Capital One's course of conduct commonly, and adversely, affected the entire class, and submitted evidence supporting that allegation. The class members are similarly situated with regard to the readily determined, allegedly excessive number of fees they incurred as a result of this standardized process. The class is unified by both common questions and a common interest. The evidence necessary to establish Plaintiffs' claims is common to both the named Plaintiffs

and all members of the class; they all seek to prove that Capital One's high-to-low re-sequencing practice was wrongful. That evidentiary presentation involves the same evidence of (i) Capital One's form contracts, with similar terms, applicable to all Plaintiffs and class members; (ii) Capital One's systematic re-sequencing of debt transactions from high-to-low for all Plaintiffs and class members through its automated software programs; and (iii) the overdraft limits that Capital One secretly established for all Plaintiffs and class members in order to maximize overdraft fees and minimize risk to the Bank.

Capital One points out variations in the applicable account agreements, including the language describing its high-to-low posting practice, the total number of pages, the different font sizes used, and how the agreements were presented to customers. These differences are not material. Plaintiffs allege that the Bank failed to fully disclose its unlawful practices, and concealed material aspects of its scheme from all of its customers (a contention supported by deposition testimony by the Bank's employees), and thus the fact that some parts of its scheme were arguably disclosed does not absolve the Bank of liability. Moreover, whether the disclosures in its account agreements suffice to adequately inform the members of the class of the Bank's practices, and would undermine the class claims, is a question common to all class members, and thus one which predominates. *Cf. Gutierrez*, 730 F. Supp.2d at 1116 (merely informing customers that the bank posts high-to-low does not fairly disclose *how* that practice could impact the number of overdrafts imposed). It is susceptible to resolution by the finder of fact based on a review of the relevant documents alone.

Unique defenses rarely predominate where a common course of conduct is established. *Wahl v. Midland Credit Mgmt.*, 243 F.R.D. 291, 297-298 (N.D. Ill. 2007); *Demmick v. Cellco P'ship*, 2010 U.S. Dist. LEXIS 94041, 20-21 (D.N.J. Sept. 8, 2010). Contrary to Capital One's

arguments, there are no unique defenses asserted against the Plaintiffs that threaten to become the focus of this litigation. The defenses asserted here against Plaintiffs are related to the class claims and are typical of those that Capital One will assert against the class.

As discussed below, Plaintiffs have met their burden of showing that common issues of fact and law will predominate within the subclasses they have proposed, as to each of their claims. As this Court observed in *Larsen*, the Court may certify multi-state classes even if "different claims or issues are subject to different bodies of law that are not the same in functional content but nonetheless present a limited number of patterns that the court . . . can manage by means of" sub-classing. 275 F.R.D. at 679–80 (quoting American Law Institute, *Principles of the Law: Aggregate Litigation* § 2.05(b) (2010)).

(i) <em>Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing Claims</em>

As an initial matter, the Court finds that Plaintiffs have appropriately and timely alleged a breach of express contract in the Complaint, the Motion for Class Certification and the Trial Plan. Further, the Court is not persuaded by Capital One's objection that individual class members' preferences for posting order and expectations concerning overdraft fees will undermine the common issues in Plaintiffs' claim for breach of contract and breach of the implied covenant of good faith and fair dealing. The reasonable expectations of a party to a standardized form contract are judged objectively, from the perspective of a reasonable person, making the subjective views of class members irrelevant.[22]

---

[22] *See, e.g., Parcel Tankers, Inc. v. M/T Stolt Luisa Pando*, 787 F. Supp. 614, 618 (E.D. La. 1992); *In re Chase Bank USA, N.A. "Check Loan" Contract Litig.*, 274 F.R.D. 286, 290 (N.D. Cal. 2011) ("the reasonable expectations of the class [asserting a good faith and fair dealings claim under Delaware law] are measured by an objective standard"); *Clancy v. King*, 954 A.2d 1092, 1108 (Md. 2008) (under Maryland law, objective standard applies); *see also Larsen* ("breach of the duty good faith and fair dealing may be shown by class-wide evidence of a defendant's subjective bad faith or objectively unreasonable conduct.").

(ii)   *Unconscionability Claims*

Common issues also predominate as to the unconscionability claims.   Because unconscionability is judged "at the time the contract was made,"[23] the Court holds that disclosures made after customers' accounts were opened are immaterial to the analysis.   The account agreements are materially similar, and a fact-finder could conclude, based on subclass-wide proof, that Capital One's alleged failures to disclose the operative features of its overdraft policies were so unfair and overreaching as to be unconscionable.   *See Davis v. Cash For Payday, Inc.*, 193 F.R.D. 518, 522-23 (N.D. Ill. 2000) (certifying unconscionability class claim because common issues predominate); *In re United Cos. Fin. Corp.*, 276 B.R. 368, 375–76 (D. Del. 2002) (collecting cases).

Common issues also predominate for procedural unconscionability, which looks to considerations like the disparity in bargaining power between the parties, *e.g.*, *Kinkel v. Cingular Wireless L.L.C.*, 857 N.E.2d 250, 264 (Ill. 2006), whether the contract was presented on a take-it-or-leave-it basis, *id.* at 265, and whether important terms are hidden in a maze of fine print. *See, e.g.*, *Glassford v. Brickkicker*, 35 A.3d 1044, ¶¶ 28–30 (Vt. 2011); *see also* **DE #514** at 5–6. Capital One's customers were similarly situated *vis-à-vis* the Bank,[24] so the issues having to do with differences in customers' backgrounds are immaterial, particularly since the class definition excludes Capital One's officers or directors.   Whether or not the claims of unconscionability succeed, they will be decided by reference to common proof at trial.

(iii)   *Unjust Enrichment Claims*

---

[23] *See Zapatha v. Dairy Mart, Inc.*, 408 N.E.2d 1370, 1375 (Mass. 1980); *see also* E. ALLAN FARNSWORTH, CONTRACTS, § 4.28 n. 53 (2d ed. 1990) ("UCC 2-302 does make it clear that any unfairness in the terms is to be judged at the time the contract is made and not at some later time").

[24] *See* Dep. Tr. of T. Stanmeyer (Ex. 1 to Class Certification Br.), at 214:24–215:23; Dep. Tr. of E. Brunken (Ex. 5 to Class Certification Br.), at 95:3–16.

Unjust enrichment claims can be certified for class treatment where there are common circumstances bearing on whether the defendant's retention of a benefit from class members was just or not. *See James D. Hinson Elec. Contr. Co. v. Bellsouth Telecomms., Inc.*, 275 F.R.D. 638, 647 (M.D. Fla. 2011).[25] That situation exists in this case. Based on the evidence presented, class-wide proof is available to show that Capital One deliberately concealed from all customers important information about its overdraft policy – including the existence and amount of customers' overdraft limits and the impact that the two-buckets sorting order had to increase the incidence of overdrafts – factors which bear on the justness of Capital One's retention of the excess overdraft fees it collected as a result.

Based on the record before the Court, the Eleventh Circuit's opinion in *Vega* does not dictate a different conclusion. In that case, *supra* at 9, different employee-plaintiffs possessed markedly different levels of knowledge and understanding of the commission systems established by the defendant's employment contracts based on information they may or may not have received from the defendant. *Id.* at 1274–75. Here, however, there is no evidence that any class members learned the true nature and impact of Capital One's exploitative scheme; mere awareness of the *fact* of high-to-low posting is only part of the equation. For example, it is undisputed that Capital One's customers were not informed about the existence and amount of the secret credit limits the Bank utilized to generate additional overdraft fees. Unlike in *Vega*, Capital One's exploitive practices remained concealed. Thus, this case is like others in which certification of unjust enrichment claims is proper.

In summary, Capital One's corporate policies "constitute the very heart" of the claims for which Plaintiffs seek class certification; as a result, common issues will predominate because

---

[25] *See also County of Monroe v. Priceline.com, Inc.*, 265 F.R.D. 659, 671 (S.D. Fla. 2010); *Cassese v. Wash. Mut., Inc.*, 255 F.R.D. 89, 97–98 (E.D.N.Y. 2008).

those policies "would necessarily have to be re-proven by every plaintiff." *Klay*, 382 F.3d at

1257; *see also Allapattah*, 333 F.3 d at 1261.

The Court notes that the problems plaguing the proposed classes in *Sacred Heart Health*

*Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159 (11th Cir. 2010), and *Klay*

are not present here. In *Klay*, supra at 5, the court ultimately found certification of the breach of

contract claims inappropriate given the individualized issues of fact they entailed, even though

questions of contract law were common to the whole class. *Id.* at 1261. There were many

different defendants with many different contracts with many different provider groups.

Moreover, because the defendants breached the contracts through a variety of means and

differing computer algorithms that were not subject to generalized proof, each physician would

have to prove a variety of individual circumstances leading to the breach. *Id.* at 1263–64.

Similar problems precluded certification in *Sacred Heart*, where there were substantial variations

in the terms of over 300 hospital contracts that were individually negotiated, leading the court to

find that "the diversity of the material terms is overwhelming." *Sacred Heart*, 601 F.3d at 1171–

72. In contrast, the agreements at issue here are, with the few exceptions noted above, uniform

form contracts offered on a take-it-or-leave it basis and were not the product of any individual

negotiation. *See id.* at 1171 ("It is the form contract, executed under like conditions by all class

members, that best facilitates class treatment."). Nor need Plaintiffs prove a variety of individual

circumstances supporting the breach, as Capital One's standard re-sequencing policy resulted in

uniform conduct directed at all members of the class.

Judge Alsup's certification in *Gutierrez* is also instructive. Wells Fargo, like Capital One,

contended that individual issues predominated, but the court found the "challenged practice is a

standardized one applied on a routine basis to all customers." *Gutierrez v. Wells Fargo Bank,*

*N.A.*, No. 07-05923, 2008 WL 4279550, at *17 (N.D. Cal. Sept. 11, 2008). Thus, while "there
will be some individual issues . . . these individual variations will not predominate over the
pervasive commonality of the highest-to-lowest method and its adverse impact on hundreds of
thousands of depositors." *Id.* Here, as in *Gutierrez*, Plaintiffs allege that Capital One exercised its
discretion in bad faith by re-sequencing debit card transactions posted to their checking accounts
from highest to lowest in order to maximize overdraft penalties against customers. Moreover, as
in *Gutierrez*, Capital One's "challenged practice is a standardized one applied on a routine basis
to all customers."*Id.* Any individual issues will "not predominate over the pervasive
commonality of the highest-to-lowest posting method and its adverse impact on hundreds of
thousands of depositors." *Id.*

### B. Superiority

A class action is the only realistic way Plaintiffs' claims can be adjudicated. "Separate
actions by each of the class members would be repetitive, wasteful, and an extraordinary burden
on the courts." *Kennedy v. Tallant*, 710 F.2d 711, 718 (11th Cir. 1983). The class action fills an
essential role when the plaintiffs would not have the incentive or resources to prosecute
relatively small claims in individual suits, leaving the defendant free from legal accountability.
The Supreme Court has long recognized that where, as here, "it is not economically feasible to
obtain relief within the traditional framework of a multiplicity of small individual suits for
damages, aggrieved persons may be without any effective redress unless they may employ the
class-action device." *Deposit Guar. Nat. Bank of Jackson, Miss. v. Roper*, 445 U.S. 326, 339
(1980). "[T]he class action device is the only economically rational alternative when a large
group of individuals or entities has suffered an alleged wrong, but the damages done to any
single individual or entity are too small to justify bringing an individual action." *In re Am.*

*Express Merchants' Litig.*, 634 F.3d 187, 194 (2d Cir. 2011); *see, e.g., Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) (noting that the class action mechanism may empower "plaintiffs to pool claims which would be uneconomical to litigate individually," such as when most of them "would have no realistic day in court if a class action were not available."); *Holmes v. Continental Can Co.*, 706 F.2d 1144, 1154 (11th Cir. 1983) ("[T]he class attorney, who is familiar with the facts and the progress of the litigation, will be able to present the claimant's case. If relegated to a new suit, the individual might be unable to obtain counsel to prosecute his action when the amount of individual damages is relatively small ... By obviating the need to bring a new lawsuit, the expense of litigating the new individual claim is reduced.") (quoting *Pettway v. Am. Cast Iron Pipe Co.*, 576 F.2d 1157, 1220 n.80 (5th Cir. 1978), *cert. denied*, 439 U.S. 1115 (1979)).

Here, class treatment is superior to other available methods for the fair and efficient adjudication of the controversy. Nearly all of the class members in this case have claims that are so small that it would cost them much more to litigate an individual case than they could ever hope to recover in damages, and thus there is no reason to believe that the putative class members have any particular interest in controlling their own litigation. Capital One argues that class members may prefer an alternative posting order (a proposition for which it has offered little proof), but the legal and expert costs alone needed to litigate the case and calculate the damages would far exceed any individual class members' recovery, and Capital One does not demonstrate anything to the contrary. In fact, Capital One does not seem to directly challenge the superiority of class treatment at all. Concentrating the litigation in this forum is logical and desirable.

As discussed above, class members are readily ascertainable through objective criteria:

Capital One's own records of individuals who were assessed overdraft fees. Plaintiffs' expert will formulate calculations that can identify members of the class by running queries in Capital One's computer records. Such calculations will be merely ministerial in nature, and will not be plagued by resolution of individual class members' issues. Damages will be calculated using the same Capital One records used to identify the class members. These facts make this case eminently manageable as a class action. In any event, the manageability factor is seldom sufficient in and of itself to defeat certification, and multiple individual lawsuits would be substantially less manageable in any event. *See Klay*, 383 F.3d at 1272. Accordingly, the Court finds that Plaintiffs have met the superiority requirement of Rule 23(b)(3).

### C. Affirmative Defenses

Capital One's affirmative defenses do not defeat certification of the class. Affirmative defenses must meet the pleading standards in *Iqbal* and *Twombly*. *See Castillo v. Roche Labs., Inc.*, No. 10-20876-CIV, 2010 U.S. Dist. LEXIS 87681, at *5 (S.D. Fla. Aug. 2, 2010) (noting that "a majority of district courts in Florida have applied this heightened pleading standard to affirmative defenses"). A number of Capital One's affirmative defenses are insufficiently pled, as they are mere "labels and conclusions," consisting of one or two sentence allegations formulaically reciting the elements of the affirmative defenses. *Id.* Thus, these defenses cannot withstand a motion to strike, much less preclude class certification.

Even if Capital One's affirmative defenses were sufficiently pled, they still do not defeat certification here because they raise common questions of proof which predominate over individualized issues. Many of the affirmative defenses require a party to have had *full*

*knowledge* of the circumstances in order for the defense to prevail, including ratification,[26]

waiver,[27] voluntary payment,[28] estoppel,[29] consent,[30] and failure to mitigate.[31] *See Larsen*, 275

---

[26] *See Sutton Steel & Supply, Inc. v. Bellsouth Mobility, Inc.*, 875 So. 2d 1062, 1070 (Ct. App. La. 2004) (the affirmative defense of ratification does not make class certification inappropriate because it does not affect the initial determination of the defendant's liability); *E. Devoe Tompkins, Inc., v. City of Bridgeport*, 123 A. 135, 137 (Conn. 1923) (requiring "full knowledge" for ratification). *Accord Dannley v. Murray*, No. 5383, 1978 Del. Ch. LEXIS 657 (Ch. July 3, 1980); *Thermo Contracting Corp. v. Bank of N.J.*, 354 A.2d 291, 296 (N.J. 1976); *N.Y. State Med. Transporters Ass'n, Inc. v. Perales*, 566 N.E.2d 134, 137 (N.Y. 1990).

[27] *See Roy v. Metro. Prop. & Cas. Ins. Co.*, 909 A.2d 980, 982 (Conn. App. Ct. 2006) (holding that "[w]aiver involves an *intentional* relinquishment of a *known* right") (emphasis added and internal quotation marks omitted). *Accord Amirsaleh v. Bd. of Trade of N.Y., Inc.*, 27 A.3d 522, 529-30 (Del. 2011); *County of Morris v. Fauver*, 707 A.2d 958, 970 (N.J. 1998); *Fish King Enters. v. Countrywide Ins. Co.*, 930 N.Y.S.2d 256, 259 (App. Div. 2011).

[28] *See Eagle Maint. Servs., Inc. v. Dist. of Columbia Contract Appeals Bd.*, 893 A.2d 569 (D.C. 2006) (The voluntary payment doctrine . . . provides that money *voluntarily paid* under a claim of right to the payment, and *with knowledge of the facts* by the person making the payment, cannot be recovered by the payor . . .) (emphasis added and internal quotation marks omitted); *In re US Foodservice Inc.*, No. 3:07-md-1894, 2011 U.S. Dist. LEXIS 138238, at *29-30 (D. Conn. Nov. 29, 2011) ("even assuming that the plaintiffs had *some* knowledge . . . the voluntary payment doctrine would not apply as [the defendant] has not shown, at this time, that the plaintiffs had *full* knowledge of the facts" (emphasis in original)). *Accord City of Camden v. Green*, 25 A. 357, 357 (N.J. 1892); *Pike v. N.Y. Life Ins. Co.*, 901 N.Y.S.2d 76, 83 (App. Div. 2010); *City of Key W. v. Fla. Keys Cmty. Coll.*, No. 3D11-417, 2012 WL 126858 (Fla. 3d DCA Jan. 18, 2012). *See also Fink v. Time Warner Cable*, No. 08-9628, 2011 U.S. Dist. LEXIS 100804, at *40 (S.D.N.Y. Sept. 6, 2011) ("[T]he voluntary payment doctrine does not apply when a plaintiff's claim is predicated on a lack of full disclosure by defendant.").

[29] *See Dayton Sec. Assocs. v. Avutu*, 664 N.E.2d 954, 957 (Ohio Ct. App. 1995) (estoppel requires "full knowledge of the facts"). *Accord Taner v. Atl. Cas. Ins. Co. of Newark*, 116 A.2d 798, 800 (N.J. App. Div. 1955); *Ryder Truck Rental, Inc. v. Williamstown Wire & Cable Co.*, 309 N.Y.S.2d 508, 511 (Sup. Ct. 1970).

[30] *See Fisher v. Virgina Elec. and Power Co.*, 217 F.R.D. 201, 217 (E.D. Va. 2003) (the defenses of statute of limitations and consent do not defeat class certification because all the class claims are based on the same legal and remedial theories).

[31] *See White Truck Sales of Indianapolis, Inc. v. Shelby Nat'l Bank*, 420 N.E.2d 1266, 1272 (Ind. Ct. App. 1981) (holding that "it would be illogical to require [the plaintiff] to mitigate damages when it was without knowledge of [the] breach"); *Ingraham v. Trow-Bridge Builders*, 687 A.2d 785, 791 (N.J. App. Div. 1997) (for mitigation, a party is required to have "reason to know"); *Handelsgesellschaft Scharfe mbH & Co. v. Krapf & Sons, Inc.*, No. 84C-11, 1985 Del. Super. LEXIS 1327, at *13 (Super. Ct. Sept. 19, 1985) (mitigation inapplicable in the absence of knowledge).

F.R.D. at 677–78 & n.8. Plaintiffs allege, and offer evidence to prove, that Capital One concealed material aspects of its overdraft scheme from its customers, including its invariable use of high-to-low transaction processing order, the rationale and effect of its two-bucket debit sorting order to maximize revenues, and the existence and amount of overdraft limits. If Plaintiffs can prove these facts, they will undercut Capital One's defenses through the use of common evidence. To the extent Capital One could prove that some customers obtained full knowledge of Capital One's scheme – which Plaintiffs deny occurred prior to the implementation of Regulation E – yet continued to incur and pay overdraft fees, the presence of individualized defenses as to a small number of class members would not destroy the predominance of common liability questions. *See Smilow v. Southwestern Bell Mobile, Sys., Inc.*, 323 F.3d 32, 39 (1st Cir. 2003); *Dupler v. Costco Wholesale Corp.*, 249 F.R.D. 29, 45 (E.D.N.Y. 2008).

Other affirmative defenses such as accord and satisfaction, ratification, and setoff pertain to damages, and can be accounted for in Plaintiffs' expert's calculations. *See Larsen*, 275 F.R.D. at 677 (set-off defense does not destroy predominance); *Carbajal v. Capital One F.S.B.*, 219 F.R.D. 437, 441 n.2 (N.D. Ill. 2004); *Allen v. Holiday Universal*, 249 F.R.D. 166, 177, 191 (E.D. Pa. 2008). The Eleventh Circuit has made clear that individual issues relating to damages do not defeat class certification. *See Allapattah*, 333 F. 3d at 1261; *Sacred Heart*, 601 F. 3d at 1178. Mitigation of damages, like the other damage-related affirmative defenses, is not a barrier to class certification. *See, e.g., In re Currency Conversion Fee Antitrust Litig.*, 264 F.R.D. 100, 116 (S.D.N.Y. 2010); *New England Carpenters Health Benefits Fund v. First Databank, Inc.*, 244 F.R.D. 79, 87 (D. Mass. 2007); *In re Cardizem CD Antitrust Litig.*, 200 F.R.D. 326, 347 (E.D. Mich. 2001). Further, neither extraordinary efforts nor an obligation to incur further expense or

risk is required. *See, e.g., Murray v. New York City Transit Auth.*, 862 N.Y.S.2d 706, 708 (N.Y. App. Term 2008); *Associated Metals & Minerals Corp. v. Dixon Chem. & Research, Inc.*, 197 A.2d 569, 583 (N.J. App. Div. 1963).

Capital One contends that class certification must be denied because there are individual issues regarding the application of various states' statutes of limitations as an affirmative defense. Courts consistently hold, however, that the statute of limitations does not bar class certification, even where there are certain individual issues.[32] The controlling issue here, as it was in *Larsen*, is simply whether Capital One "engaged in a systematic scheme to extract the greatest possible number of overdraft fees from Plaintiffs and similarly situated [Capital One] consumers across the country." 275 F.R.D. at 670. Plaintiffs' claims can be determined by class-wide proof, as can those of the members of the Class. As such, Capital One's affirmative defenses are inadequate to defeat class certification.

**D. The Use of Subclasses**

The Court further finds that the creation of subclasses to address variations in state law is appropriate here and will make this case manageable as a class action. *See, e.g., Klay*, 382 F.3d at 1262 (noting that "if applicable state laws can be sorted into a small number of groups, each containing materially identical legal standards, then certification of subclasses embracing each of the dominant legal standards can be appropriate."). The court may authorize aggregate treatment of multiple claims, or of a common issue therein, by way of a class action if the court determines

---

[32] *Piscioneri v. Commonwealth Land and Title Insur. Co.*, Civ. A. No. 010764, 2004 N.Y. Misc. LEXIS 256, at *1, *27 (N.Y. Sup. Ct. Jan. 8 2004) (finding that the affirmative defenses of estoppel, statute of limitations, and ratification, do not prevent class certification because the central issue in the case is whether the putative class was harmed by the defendant's actions); *La Grasta v. First Union Securities, Inc.*, No. 2:01-251, 2005 U.S. Dist. LEXIS 20207, at *19-20, 30 (M.D. Fla. 2005); *Board of Trustees of the AFTRA Ret. Fund v. JPMorgan Chase Bank, N.A.*, 269 F.R.D. 340, 353 n.129 (S.D.N.Y. 2010).

that:

    (1)    a single body of law applies to all such claims or issues;

    (2)    different claims or issues are subject to different bodies of law that are the same in functional content; or

    (3)    different claims or issues are subject to different bodies of law that are not the same in functional content but nonetheless present a limited number of patterns that the court . . . can manage by means of identified adjudicatory procedures.

American Law Institute, *Principles of the Law: Aggregate Litigation* § 2.05(b) (2010). Complete uniformity of state law is not required as long as there are no material conflicts among the laws. *See Southern States Police Benev. Ass'n v. First Choice Armor & Equip., Inc.,* 241 F.R.D. 85, 90-91 (D. Mass. 2007). As this Court recently observed, the Court may certify multi-state classes even if "different claims or issues are subject to different bodies of law that are not the same in functional content but nonetheless present a limited number of patterns that the court . . . can manage by means of" sub-classing. *Larsen,* 275 F.R.D. at 679–80 (internal quotations omitted).

The proposed special verdict forms and supporting surveys of law submitted by Plaintiffs with their Trial Plan illustrate that the variations among the potentially applicable state laws are not material and can be managed to permit a fair and efficient adjudication by the fact-finder at trial. As detailed in Plaintiffs' Trial Plan, for their claims for breach of contract and breach of the covenant of good faith and fair dealing, Plaintiffs propose just one subclass. For unconscionability and unjust enrichment, Plaintiffs propose just three subclasses each. Each subclass will have its own start date linked to the statute of limitations for each of those claims. For the reasons set forth earlier, common issues predominate with respect to each of these claims. As set forth below, the subclasses proposed by Plaintiffs contain materially identical legal standards which facilitate the manageability of this case as a class action.

(i)    *The Breach of Contract and the Breach of the Implied Covenant of Good Faith and Fair Dealing Claims*

The glue that binds this subclass together is the RESTATEMENT (SECOND) OF CONTRACTS §205 (1981), which each of the jurisdictions in question recognizes for the rule that the duty of good faith and fair dealing is implied in every contract. *See* Trial Plan **(DE #2314)**, at 9–10 & Ex. A thereto.[33] The fact that some states prohibit an implied-covenant claim where the actions complained of are expressly permitted by the contract, as Capital One contends, does not create material variations for the issues being certified. *See In re Telectronics Pacing Sys., Inc.*, 172 F.R.D. 271, 292 (S.D. Ohio 1997). Nor is an inquiry into the subjective state of mind of each customer's expectations or preferences required. The Court finds on these facts that the issues bearing on the justness of Capital One's systemic conduct predominates within each proposed subclass and this claim remains appropriate for class treatment. Accordingly, as set forth above, the Court holds that Plaintiffs have adequately alleged a breach of express contract as well as a breach of the implied covenant of good faith and fair dealing, and this subclass is therefore certified.

(ii)    *The Unjust Enrichment Claims*

The Court previously ruled that Plaintiffs may proceed in the alternative with claims for unjust enrichment and breach of contract. *See* Order Granting in Part, Denying in Part Motion to Dismiss **(DE #305)**, at 32–33. As the Court held, Capital One may attempt to force an election of remedies through a dispositive motion at an appropriate juncture in the case, but the coexistence of these unjust enrichment claims with contractual claims does not affect the manageability of the class action. Specifically, the Court perceives no material differences in the elements of

---

[33] Plaintiffs do not seek to certify a class in the State of Texas for a Breach of Contract and the Breach of the Implied Covenant of Good Faith and Fair Dealing Claims, and accordingly, no such class is certified under Texas law.

unjust enrichment under the laws of Delaware and New York which would preclude common

grouping in the manner set forth in Plaintiffs' Trial Plan.  At their core, each unjust enrichment

subclass proposed by Plaintiffs flows from the RESTATEMENT (FIRST) OF RESTITUTION § 1. Trial

Plan **(DE #2314)**, at 10–11 & Ex. B thereto.

    The states in Subclass No. 1, which include Connecticut, District of Columbia, Maryland,

Mississippi,[34] follow the RESTATEMENT's three elements:  (i) the plaintiff conferred a benefit; (ii)

the defendant accepted or retained that benefit; (iii) under circumstances that would be unjust for

the defendant to retain the benefit. *News World Communications, Inc. v. Thompsen*, 878 A.2d

1218, 1222 (D.C. 2005). .

    The states in Subclass No. 2, which include Delaware, Louisiana, New Jersey and New

York, follow the definition of unjust enrichment in the RESTATEMENT but also require proof that

the plaintiff lacks an adequate remedy at law. *See, e.g., Nemec v. Shrader*, 991 A.2d 1120, 1130

(Del. 2010); *Leibowitz v. Cornell Univ.*, 584 F.3d 487, 509 (2d Cir. 2009). While *Nemec*,

applying Delaware law, lists five elements, four are subsumed within the three RESTATEMENT

elements. The fourth element of inadequate remedy at law and the fifth *Nemec* element of

"impoverishment" are not actually required. *See MetCap Sec. L.L.C. v. Pearl Senior Care, Inc.*,

2009 Del. Ch. LEXIS 28, at *5 n.26 (Del. Ch. Feb. 27, 2009), *aff'd*, 977 A.2d 899 (Del. 2009).

Because Subclass No. 2 subsumes Subclass No. 1, Ms. Steen may naturally represent both the

first and second unjust enrichment subclasses.

    Texas is the lone Subclass No. 3 state. Texas follows the RESTATEMENT elements, but

also requires proof that the defendant engaged in wrongful conduct.  In Texas, unjust enrichment

occurs when the person sought to be charged has wrongfully secured a benefit or has passively

---

[34] Capital One denies that class members exist in Mississippi.  This is a question of fact
which can be addressed during the merits phase of this litigation.

received one which it would be unconscionable to retain. *See City of The Colony v. N. Texas Mun. Water Dist.*, 272 S.W.3d 699, 731 (Tex. App. 2008). Thus, a party may recover under the theory of unjust enrichment when one person has obtained a benefit from another by fraud, duress, or the other taking of an undue advantage. *Id.* Mr. Menyweather, a Texas resident, may represent the third unjust enrichment subclass.

There is ample authority for certifying multi-state class unjust enrichment claims using subclasses under circumstances akin to this case. *See, e.g., In re Terazosin Hydrochloride Antitrust Litig.*, 220 F.R.D. 672, 697 n.40 (S.D. Fla. 2004); *In re Mercedes-Benz Tele Aid Contract Litig.*, 267 F.R.D. 113, 119 (D.N.J. 2010). The Court deems it appropriate to follow suit here.

### (iii)    *The Unconscionability Claims*

Plaintiffs' Trial Plan proposes three workable subclasses for Plaintiffs' unconscionability claims, each of which is based on Uniform Commercial Code § 2-302.[35] The only differences among the states pertain to whether both procedural and substantive unconscionability are required. Trial Plan **(DE #2314)**, at 11–13 & Ex. C thereto. Subclass No. 1 includes states that require procedural and substantive unconscionability, and therefore subsumes Subclass No 2 (states which require only substantive unconscionability) and Subclass No 3 (states which require either procedural or substantive unconscionability).

The Court has previously addressed the question of whether unconscionability may be pled as an affirmative claim. *See* **DE #305** at 26 (concluding that while unconscionability is

---

[35] Louisiana has not expressly adopted U.C.C. § 2-302 and does not use the terms *procedural* and *substantive*, but nevertheless recognizes that both must be present to succeed in bringing an unconscionability claim. An unconscionable contract or term is lacking the free consent that the Louisiana Civil Code requires of all contracts. *See Lafleur v. Law Offices of Anthony G. Buzbee, P.C.*, 960 So. 2d 105, 112 (La. Ct. App. 2007). To be invalidated, a provision must possess features of both adhesionary formation and unduly harsh substance. *Id.*

normally a defense, in the circumstances of these cases, it is appropriate to permit it as an affirmative claim). The Court remains convinced that its earlier conclusion is correct, and that the Court's equitable powers permit a declaration that Capital One's contractual clauses purporting to reserve discretion to re-sequence debit card transactions highest-to-lowest so as to maximize overdraft fee charges are unconscionable under each of the affected state's laws. Again, the Court finds that Capital One's customers' individual preferences, knowledge and level of sophistication is not relevant to this inquiry.

The Court accordingly certifies Plaintiffs' proposed subclasses, as set forth more particularly in the table set forth below.

## CONCLUSION

After careful consideration, and being fully advised as set forth above and in accordance with the findings herein, it is hereby

**ORDERED, DECREED, AND ADJUDGED** as follows:

1. Plaintiffs' Motion for Class Certification **(DE #2313)** is **GRANTED**. The Court certifies the following class:

> All Capital One customers in the United States who, within the applicable statute of limitations preceding the filing of this action to August 13, 2010 (the "Class Period"), incurred an overdraft fee as a result of Capital One's practice of re-sequencing debit card transactions from highest to lowest dollar amount (the "National Class").

> Excluded from the Class are Capital One; its parents, subsidiaries, affiliates, officers and directors; any entity in which Capital One has a controlling interest; all customers who make a timely election to be excluded; and all judges assigned to this litigation and their immediate family members.

2. The Court appoints Plaintiffs R. Leanne Steen and Terrance Menyweather as representatives of the Class, and as representatives of the following specific, certified subclasses:

| Subclass | Number | Representative | States |
|---|---|---|---|
| Breach of Contract and Breach of the Implied Covenant of Good Faith and Fair Dealing | 1 | Leanne Steen | LA |
| Unjust Enrichment | 1 | Leanne Steen | CT, D.C., MD, MS |
| Unjust Enrichment | 2 | Leanne Steen | DE, LA, NJ, NY |
| Unjust Enrichment | 3 | Terrance Menyweather | TX |
| Unconscionability | 1 | Leanne Steen, Terrance Menyweather | CT, DE, D.C., LA, MD, NJ, TX |
| Unconscionability | 2 | Leanne Steen, Terrance Menyweather | NY, VA |
| Unconscionability | 3 | Leanne Steen, Terrance Menyweather | MS |

3. The Court also appoints the following firms as Class Counsel pursuant to Fed. R. Civ. P. 23(g): Bruce Rogow, P.A.; Podhurst Orseck, P.A.; Grossman Roth, P.A.; Baron & Budd, P.C.; Golomb & Honik, P.C.; Lieff Cabraser Heimann & Bernstein LLP; Trief & Olk; and Webb, Klase & Lemond, L.L.C.[36]

**DONE AND ORDERED** in Chambers at the James Lawrence King Federal Courthouse, Miami-Dade County, Florida, this 18th day of July, 2012.

JAMES LAWRENCE KING
UNITED STATES DISTRICT JUDGE

---

[36] The Court will address the procedure for providing notice to class members regarding the certification of the class and these claims separately.

38